**MISBOURNE PICTURES LIMITED et al. v. JOHNSON.**

United States District Court
S. D. New York.
June 15, 1950.

Choate, Byrd, Leon & Garretson, New York City, Maurice Leon, New York City, of counsel, for plaintiffs.

Irving H. Saypol, U. S. Atty. for Southern District of New York, New York City, James A. Devlin, Asst. U. S. Atty. New York City, of counsel, for defendant.

S. H. KAUFMAN, District Judge.

The question presented by this case is whether or not plaintiffs are entitled to recover, with interest, $60,300 which was paid to defendant on account of taxes claimed to have become due as the result of a certain transaction between plaintiffs and Samuel Goldwyn, Inc., a New York corporation, and Samuel Goldwyn, individually.

The case was submitted to the court for decision on a stipulation of facts, from which the court finds:

Plaintiffs are corporations organized and existing under the laws of the Kingdom of Great Britain and Northern Ireland, and are engaged in the business of producing and distributing motion pictures. Their places of business are in London, England, and they have no offices or places for the transaction of business in the United States.

The tax payment in question was made to defendant, the Collector of Internal Revenue, for the Third District, and the transaction out of which it arose was as follows:

On February 9, 1942, plaintiffs and Samuel Goldwyn, Inc. entered into a contract, the interest of the latter thereunder having subsequently been assigned to Samuel Goldwyn, individually. Pursuant to this agreement, the Goldwyn interests permitted plaintiffs, in the making of a motion picture called "Spitfire", to use the services of an actor who was under contract to Goldwyn. After completion of the picture, and in accordance with Article 2 of the contract, a print of the picture was delivered to Goldwyn in September, 1942, and Goldwyn had the option, exercisable within ten days after receipt of the print, "of acquiring the exclusive rights to distribute the said film in all parts of the world other than the British territory * * * [therein defined] * * * and Australasia".[1] Art. 3(a).

Goldwyn exercised the option on October 7, 1942 by the dispatch of a cable to General Film Distributors Limited, one of the plaintiffs, at its London office. There-

1. The British Territory was defined to mean "the United Kingdom of Great Britain and Northern Ireland Eire the Isle of Man the Channel Isles (when the same are not enemy territory) Malta Gibraltar and ships flying the British flag." Art. 3(d).

after, on December 4, 1942, Goldwyn received the original negative and sound track of the film, and paid to General Film Distributors Limited the equivalent of £50,000 ($40,000 and £40,000). This payment was made pursuant to a provision of the contract which reads: "Goldwyn shall within ten days after the delivery to them of the original negative and sound track and negative cut-outs and complementary sound track (if any) of the film with sample print thereof mentioned in the foregoing sub-clause advance to the Producers the sum of Fifty thousand pounds * * * ." Art. 4(c).

On the payment of said sum, the contract conferred on Goldwyn the right "to make any arrangements or enter into any contracts containing such terms and conditions in connection with the distribution and advertisement of the film without any consent being required on the part of the Producers or alternatively may convey any distribution rights to others in all parts of the world other than the British territory and Australasia aforesaid to such persons and upon such terms in such form and upon such conditions as Goldwyn in their discretion may think fit." Art. 4(e).

The contract also provided that the Producers (plaintiffs) would receive 55% of the distributors' gross, and the distributors (Goldwyn) would receive 45% thereof, and that the Producers' 55% should be retained by Goldwyn until the "advance of Fifty thousand pounds is recouped to Goldwyn thereout." Art. 4(g).

Goldwyn thereafter distributed the motion picture in the United States and recouped the sum of £50,000 solely out of the proceeds of this exploitation, as contemplated by the aforesaid provision of the contract.

Subsequently, some doubt having been raised as to whether the £50,000 payment should have been subject to withholding tax under the Internal Revenue Code, 26 U.S.C.A. §§ 143, 144, counsel for plaintiffs requested an advisory opinion from the United States Treasury Department. A Deputy Commissioner of Internal Revenue, by letter dated May 17, 1944, replied that the Treasury Department did not consider the transaction a sale, but rather that "the lump sum payment amounted to the payment of an advanced royalty for the right to distribute the film in the United States." Goldwyn thereupon withheld the sum of $60,300 from payments due to General Film Distributors Limited and paid the money to defendant on October 31, 1944.

On April 9, 1945, plaintiffs made a claim for refund by defendant, which claim was disallowed. On September 12, 1946, plaintiffs made their protest, which was received by the Office of Internal Revenue Agent in Charge, Upper New York Division. More than six months having expired since the filing of the claim for refund, and no part of the sum claimed by plaintiffs having been refunded, this action was commenced on January 23, 1947. Thereafter, on February 6, 1947, plaintiffs were notified that the claim for refund had been disallowed in full by the Commissioner of Internal Revenue.

If the lump sum payment equivalent to £50,000 constituted "fixed or determinable annual or periodic gains, profits and income" within the meaning of § 143(b) of the Internal Revenue Code, it was taxable. If, on the other hand, it was the payment of the purchase price of a sale of property, it was exempt from taxation.[4] The pertinent statutes and regulations are set forth in the margin.[5]

---

4. It is conceded by defendant that if this transaction be considered a sale, no tax would be payable. Cf. Wodehouse v. Commissioner, 337 U.S. 369, 69 S.Ct. 1120; 26 C.F.R. § 29.143-2(b).

5. Section 143(b), Title 26 U.S.C.A.:
 "(b) *Nonresident aliens.*
 "All persons, in whatever capacity acting, including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States, having the control, receipt, custody, disposal, or payment of interest (except interest on deposits with persons carrying on the banking business paid to persons not engaged in business in the United States), dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or

In a series of cases involving transactions similar to that herein, the courts have referred to the "bundle of rights" theory. When one transfers, not the property itself, but only limited rights therein, such as literary or motion picture rights, he is considered to have granted a mere license, and the transaction, for tax purposes, is not a sale. The rule has been stated as follows: "* * * the grant of only a particular, separate, or partial right (i. e., serial rights, motion picture rights, and the like for all time or for only a limited time) in a literary property rather than the entire package or bundle of rights, is a license and not a sale and that income received therefor, whether payable in a lump sum or in instalments, constitutes royalties (or in the nature of, or advance, royalties), and hence is taxable as ordinary income." Fincke, An Analysis of the Income Aspects of Patents, 5 Tax Law Review 361, 371.

In Sabatini v. Commissioner, 2 Cir., 98 F.2d 753, an author granted the exclusive world-wide right, for a stated period, to produce motion pictures based on five of

periodical gains, profits, and income (but only to the extent that any of the above items constitutes gross income from sources within the United States), of any nonresident alien individual, or of any partnership not engaged in trade or business within the United States and composed in whole or in part of nonresident aliens, shall (except in the cases provided for in subsection (a) of this section and except as otherwise provided in regulations prescribed by the Commissioner under section 215) deduct and withhold from such annual or periodical gains, profits, and income a tax equal to 30 per centum thereof, except that such rate shall be reduced, in the case of a nonresident alien individual a resident of any country in North, Central, or South America, or in the West Indies, or of Newfoundland, to such rate (not less than 5 per centum) as may be provided ly treaty with such country; * * *."

Section 144, Title 26 U.S.C.A.:

"*Payment of corporation income tax at source.*

"In the case of foreign corporations subject to taxation under this chapter not engaged in trade or business within the United States, there shall be deducted and withheld at the source in the same manner and upon the same items of income as is provided in section 143 tax equal to 30 per centum thereof, except that in the case of corporations organized under the laws of any country in North, Central, or South America, or in the West Indies, or of Newfoundland such rate with respect to dividends shall be reduced to such rate (not less than 5 per centum) as may be provided by treaty with such country; and such tax shall be returned and paid in the same manner and subject to the same conditions as provided in that section: * * *."

Regulations 111, 26 CFR:

"Sec. 29.143-2. *Annual or Periodical*

*Income.*—Only fixed or determinable annual or periodical income is subject to withholding. The Internal Revenue Code specifically includes in such income, interest, dividends, rent, salaries, wages, premiums, annuities, compensations, remunerations, and emoluments. But other kinds of income are included, as, for instance, royalties.

"Income is fixed when it is to be paid in amounts definitely predetermined. Income is determinable whenever there is a basis of calculation by which the amount to be paid may be ascertained. The income need not be paid annually if it is paid periodically; that is to say, from time to time, whether or not at regular intervals. That the length of time during which the payments are to be made may be increased or diminished in accordance with someone's will or with the happening of an event does not make the payments any the less determinable or periodical. A salesman working by the month for a commission on sales which is paid or credited monthly receives determinable periodical income. The share of the fixed or determinable annual or periodical income of an estate or trust from sources within the United States which is distributable, whether distributed or not, or which has been paid or credited during the taxable year to a nonresident alien beneficiary of such estate or trust constitutes fixed or determinable annual or periodical income within the meaning of section 143(b). The income derived from the sale in the United States of property, whether real or personal, is not fixed or determinable annual or periodical income. Such items as taxes, interest on mortgages, or premiums on insurance paid to or for the account of a nonresident alien landlord by a tenant, pursuant to the terms of the lease, constitute fixed or determinable annual or periodical income."

his works. This was held not to be a sale, but a mere license to produce the pictures; the author remained the owner of his works, and merely licensed their use for a particular object for a certain period.

In Goldsmith v. Commissioner, 2 Cir., 143 F.2d 466, certiorari denied 323 U.S. 774, 65 S.Ct. 135, 89 L.Ed. 619, an assignment forever of exclusive world-wide motion picture rights in a copyrighted play was held not to be a sale. "Unless the assignment conveys to the assignee the title to the copyright, no sale of property is made." Id., 143 F.2d at page 467.

The same principle was applied in Rohmer v. Commissioner, 2 Cir., 153 F.2d 61, at page 63, certiorari denied 328 U.S. 862, where the court said: "Where a copyright owner transfers to any particular transferee substantially less than the entire 'bundle of rights' conferred by the copyright, then payment therefor, whether in one sum or in several payments, constitutes royalties * * *."

In Wodehouse v. Commissioner, 337 U. S. 369, 69 S.Ct. 1120, an alien author assigned to a domestic corporation the right to publish several stories in serial form in the United States, Canada and South America. After each story's serial publication, the domestic corporation reassigned to the alien, upon the latter's demand, all rights in and to the story excepting those rights which the alien had expressly agreed were to be retained by the corporation. The court, considering the legislative history of the applicable taxing statutes, decided that the payments for these rights were taxable. Although the majority of the court did not expressly discuss the "bundle of rights" theory, it did cite with approval the Sabatini and Rohmer cases, supra. Furthermore, implicit in the opinion is an endorsement of this approach to the problem, "as the Court adopts as a premise that the sums received by the taxpayer were 'for the use of a copyright in the United States' and hence were royalties." Allan & Coggan, Aliens and the Federal Income Tax, 5 Tax Law Review 253, 267.

In General Aniline & Film Corp. v. Commissioner, 2 Cir., 139 F.2d 759, and Commissioner v. Celanese Corp. of America, 78 U.S.App.D.C. 292, 140 F.2d 339, relied upon by plaintiffs, the same principle was applied. In those cases the vendors had parted with all, or substantially all, of their rights in certain patents, so that the transactions amounted, in effect, to complete sales. Judge Frank, who wrote the General Aniline opinion, considered the decision in his later opinion in the Rohmer case, supra, and said that in the General Aniline case the "transferee probably acquired title to the patents; * * * consequently, as we regarded the case, the patentee had transferred to a single grantee substantially all the rights it had originally acquired as patentee under the patents." 153 F.2d at page 64.

█ Under the foregoing decisions, the instant transaction was not a sale, but was a license or royalty agreement. All that Goldwyn could acquire by the exercise of the option was "the exclusive rights to distribute the said film in all parts of the world other than the British territory * * and Australasia * * *." Art. 3(a). There is nothing in the agreement which can be construed as transferring title to Goldwyn. In paragraph 4(h) of the contract, Goldwyn is restricted in the "sale of rights in connection with the *exhibition or exploitation* of the said film" until it gave notice of the proposed sale to plaintiffs, to afford them the opportunity of obtaining a better offer. (Italics for emphasis.)

The purport of the agreement, when read as a whole, is to make Goldwyn the distributor of the film for plaintiffs in certain sections of the world.

Plaintiffs contend that the contract called for the delivery to Goldwyn of certain unique chattels—the original negative, original cutouts, and original sound track—and that the payment therefor (£50,000) carried with it the right of permanent possession of these chattels, together with the right to use reproductions of them for exhibition purposes. Plaintiffs argue further that they "had to be content with reproductions which of necessity would be less perfect than those derived from the originals, in other words they had to be con-

tent with the distribution of copies of copies since they did not retain any access to the originals * * *." There is nothing in the contract, however, which prevented plaintiffs from making reproductions from the original negative and sound track prior to the time it was delivered to Goldwyn. Moreover, although the original negative and sound track are undoubtedly unique in one sense, the possession of them was apparently not essential to the exhibition of the film: plaintiffs retained the right to exhibit it in the British Territory and Australasia without any right to the possession of these originals.

Plaintiffs make the point that after receipt of the £50,000 they had no control over what Goldwyn did with the film. But the contract called upon Goldwyn to "use their best endeavours to secure good results from the distribution of the film for the benefit of all parties to this Agreement". Art. 4(f). For failure to comply with this provision, Goldwyn would undoubtedly have been liable to plaintiffs for breach of contract. This would require Goldwyn to exploit the film in the assigned territory until, commercial speaking, its value was exhausted, and this was evidently deemed sufficient protection of the assignor's retained interest.

The payment of £50,000, although termed an "advance" in the contract, was, according to plaintiffs' contention, in reality an outright payment of the purchase price. It is true that Goldwyn had no recourse against plaintiffs if the exploitation of the film proved worthless, but the fact that the amount paid would be lost to the extent that the picture proved lacking in public appeal proves only that Goldwyn took a business risk in paying first and depending for recoupment on profits from exhibition; it does not alter the fact that what Goldwyn paid it paid only for the right to exhibit the picture; not to buy it.

Although the contract gave Goldwyn exhibition rights over a great part of the world outside of the United States, since there is no basis for allocating the "royalty" payment between the United States and other countries, the entire payment is taxable to the recipient. Rohmer v. Commissioner, supra; Molnar v. Commissioner, 2 Cir., 156 F.2d 924; Estate of Alexander Marton, 47 B.T.A. 184.

Judgment for defendant. [6]

Submit findings and conclusions in accordance with this opinion.

---

**6.** It is interesting to note that the result in this case would be different under the Tax Convention between the United States and the United Kingdom of Great Britain and Northern Ireland, 60 Stat. 1377, signed April 16, 1945, proclaimed by the President of the United States on July 30, 1946, effective, for purposes of United States income and excess profits taxes, for taxable years beginning on or after January 1, 1945. 3-A Prentice-Hall Federal Tax Service, par. 57,072.