OPINION OF THE COURT
David B. Saxe, J.
On this application for summary judgment, the issue for *1089 determination is the extent of a contractual grant of "home television” rights to certain motion pictures. The contract under scrutiny here was entered into between plaintiff Video-Cinema Films, Inc. (Video-Cinema) and plaintiff Tele-Pac, Inc. (Tele-Pac) on November 18, 1964 (the 1964 Agreement), prior to the maturing of the market for videocassettes and videodiscs, but at a time when the technology of videocassettes and videodiscs must have been known to the contracting parties. The question is whether "home television” rights include a grant of videocassette and videodisc rights, i.e., the right, to record the motion pictures on videocassettes or videodiscs for viewing on home television screens.
Specifically, the plaintiffs request, inter alla, a declaratory judgment determining that plaintiff Tele-Pac is the sole, exclusive, and rightful owner of the copyrights and all renewals of such copyrights to various motion pictures; that defendant, Edmund C. Grainger, as administrator of the estate of Raymond Rohauer, deceased, has no rights or interests in these motion pictures; and, that defendant’s registration of claims to the copyrights in these motion pictures for the renewal terms are void.
In addition, Video-Cinema seeks damages due to defendant’s alleged false claims to the renewal copyrights in these motion pictures which interfered with Video-Cinema’s alleged rights to sell or license the motion pictures. In particular, Video-Cinema claims interference with a license agreement with International Video Entertainment, Inc.
In defendant’s counterclaim against Video-Cinema, it is alleged that pursuant to an agreement between Tele-Pac and Video-Cinema dated November 18, 1964, Tele-Pac continued to own all videocassette, videodisc and related rights to 26 motion pictures. It is further contended that as a result of an agreement entered into between Tele-Pac and defendant’s predecessor-in-interest, Raymond Rohauer, dated September 25, 1987, defendant is now the owner of all the videocassette and videodisc rights in these motion pictures. Defendant requests damages allegedly resulting from acts of Video-Cinema under which they agreed to license to third parties in the United States the videocassette and videodisc rights allegedly conveyed to Raymond Rohauer by Tele-Pac pursuant to the 1987 agreement.
As stated, the issue before the court is whether the contract entered into between Tele-Pac and Video-Cinema dated No *1090 vember 1987, entitling Video-Cinema to distribution rights to the motion pictures, was sufficiently broad to encompass videocassette and videodisc rights.
The 1964 Agreement entered into by the coplaintiffs which involves 26 black and white motion pictures produced and released in theatres between 1943 and 1953 provides in relevant part: "The producer (Tele-Pac) does hereby grant to the distributor (Video-Cinema) the license to distribute the said pictures set forth on Schedule A, in perpetuity, from the date hereof, for broadcasting by television or any other similar device now known or hereafter to be made known. This shall include, but not limit the said license to pay television, home television, theatrical television, etc., throughout the Territories.” (Emphasis added.)
Video-Cinema argues that according to this clause, it acquired not only the rights to conventional television and pay television but also videocassette, videodisc, or other related rights in the subject motion pictures.
The 1987 agreement between Tele-Pac and defendant’s testator, Raymond Rohauer, provided for, inter alla, Tele-Pac to "within the limits of the rights it actually owns, sell, assign, transfer and set over to Raymond Rohauer * * * all its right, title and interest of every-kind and character, including the copyrights and any renewals of copyrights” in various motion pictures, "but excepting therefrom the rights * * * previously granted to Video-Cinema Films, Inc. as per a contract dated 16 November 1964.” It further provides that "the assignment of rights shall include all forms, gouges and media in the foregoing territories, with exception of the rights granted heretofore to Video-Cinema Films, Inc.”
Defendant emphasizes that part of the 1964 contract which refers to "broadcasting” rights and urges the court to adopt a strict interpretation of the word, which he defines as "one that involves transmission of a distant signal * * * from a point outside the home to a receiver located in the home where that signal is picked up and translated into an audio reproduction or a visual image”. Defendant argues that the term "broadcasting by television” should not include videocassette rights since the use of a videocassette does not involve the receipt of "a transmission of a distant signal”.
But, the dictionary defines "broadcasting” as being "the act of transmitting sounds or images by radio or television.” (Webster’s New Collegiate Dictionary 138 [1979 ed].) If these *1091 definitional words are substituted for the word “broadcasting” in the 1964 grant clause, it would read as follows: “for transmitting sounds or images by television or any other similar device now known or hereafter to be made known. This shall include, but not limit the said license to pay television, home television, theatrical television, etc., throughout the Territories.” (Emphasis added.)
This language, I find, includes transmitting sound or images contained in a videocassette or videodisc via a VCR and a television set. It is not necessary that the transmission be over the air from a point geographically removed from the viewer; nothing in the 1964 grant clause requires that. In this context, the transmission from a videocassette through a VCR connected to the viewer’s television is no different from a closed circuit transmission via cable from a point outside the viewer’s home to his television set. I find that the 1964 grant to Video-Cinema must have included closed circuit cable transmissions of the motion pictures (although those explicit words are not used in the grant) and it does not matter whether that transmission travels many miles from a cable service company or only a few feet from a VCR to its reception on the viewer’s television screen.
Accordingly, I hold that the presence of the word "broadcasting” in the grant clause of the 1964 Agreement does not limit the broad grant of home television rights to over-the-air delivery of the audio and visual signals constituting the pictures to a television set in the recipient’s home from a sending point geographically distant from the receiver.
The absence of any limiting language in the granting clause of the 1964 Agreement lends support to the plaintiff’s argument that the words used (“for broadcasting by television or any other similar device now known or hereafter to be known”) are broad enough to cover the use of videocassette and videodisc viewing (see, Bartsch v Metro-Goldwyn-Mayer, 391 F2d 150, 155 [2d Cir 1968], cert denied 393 US 826 [1968]). In fact, the list included in the granting clause was clearly not intended to be exhaustive, as is evidenced by the use of the words "This shall include, but not limit the said license to * * * etc.” As the court noted in Rooney v Columbia Pictures Indus. (538 F Supp 211, 229 [SD NY 1982], affd 714 F2d 117 [2d Cir 1982], cert denied 460 US 1084 [1983]), “Where * * * a party has acquired a contractual right which may fairly be read as extending to media developed thereafter, the other party can hardly avoid the contract’s application to such *1092 media by establishing that the precise nature of the advance was not anticipated.”
It is undisputed that the 1964 Agreement was negotiated and executed by knowledgeable business people who were experienced in the areas of motion pictures and television. In addition, it is also undisputed that due to various articles published in prominent publications prior to 1964, the future use of video tape recorders (although probably not their scope) was made known to the general public, especially to those in the entertainment industry. The failure to use language of limitation in the 1964 Agreement, together with the parties’ experience in, and knowledge of developments in the audiovisual home-entertainment industry, supports the plaintiffs’ position that the parties intended the granting of rights to include the new technology.
Defendant’s reliance on Cohen v Paramount Pictures Corp. (845 F2d 851) is misplaced. In direct contrast to the Video-Cinema/Tele-Pac contract, the Cohen case considered a license to use a musical composition in a movie, where the license’s language explicitly specified the permitted uses, and explicitly reserved all rights not granted. The license considered in Cohen lacked the type of broad, all-inclusive language employed here, and further lacked the type of words used here which contemplate future technology (see, Cohen v Paramount Pictures Corp., 845 F2d, supra, at 853).
The interpretation I offer here is manifestly made with deference to the established principle that " '[a] contract must be read as a whole in order to determine its purpose and intent’ ” (Zodiac Enters. v American Broadcasting Cos., 81 AD2d 337, 339, affd 56 NY2d 738, citing Atwater & Co. v Panama R. R. Co., 246 NY 519).
So, I conclude that the 1964 contract should be interpreted to include the grant of videocassette and videodisc rights to Video-Cinema (see, Platinum Record Co. v Lucasfilm, Ltd., 566 F Supp 226 [NJ 1983]).
With respect to the 1987 agreement entered into between defendant’s testator and Tele-Pac, it is clear that Raymond Rohauer only obtained the rights to the motion pictures “within the limits of the rights [Tele-Pac] actually own[ed]”. *1093 And, since I have determined that Tele-Pac transferred its videocassette and videodisc rights to Video-Cinema in 1964, it could not transfer these rights to Rohauer in 1987.
Accordingly, plaintiffs’ motion to dismiss defendant’s counterclaim is granted.