**P.C. FILMS CORP., Plaintiff,**

v.

**TURNER ENTERTAINMENT CO., MGM/UA Home Video, Inc., MGM/UA Communications Co. and Warner Home Video, Inc., Defendants.**

**91 Civ. 1594 (BSJ).**

United States District Court, S.D. New York.

Feb. 6, 1997.

712

Carl I. Kaminsky, Carl I. Kaminsky, New York City, for P.C. Films Corp.

Tom Ferber, Pryor Cashman Sherman & Flynn, New York City, for Turner Entertainment Co., MGM/UA Home Video, Inc., MGM/UA Communications Co., Warner Home Video, Inc., defendant.

## OPINION

BARBARA S. JONES, District Judge:

## INTRODUCTION

The parties come before this Court for a trial on stipulated facts, seeking resolution of one narrow issue: whether a license for "perpetual" distribution rights to a motion picture either (i) terminated upon expiration of the film's initial copyright term or (ii) continues in perpetuity. This Court finds that the perpetual distribution rights endure beyond the initial copyright term.

## BACKGROUND

On August 4, 1960, Samuel Bronston Products, Inc. ("Bronston") and Metro–Goldwyn–Mayer Inc. ("MGM") executed a detailed agreement ("Basic Agreement") concerning the production, financing, and distribution of a film entitled "King of Kings" (the "Picture"). The 163–page document was the culmination of months of negotiations conducted by sophisticated and expert parties, each rep-

resented by counsel. (Deposition of Benjamin Melniker, January 9, 1992, J.Ex. 15 at R335–37) (hereinafter "Melniker Deposition").

Pursuant to the Basic Agreement, MGM paid approximately $5 million to obtain exclusive distribution rights to the Picture.[1] Specifically, the Basic Agreement provides that:

8. [MGM] shall retain in perpetuity the exclusive right to distribute the said motion picture throughout the world except in Spain, Portugal, Germany, France, Belgium, Holland, and Luxembourg. . . .

11. Subject to the provisions of this agreement [MGM] shall be vested with the perpetual and exclusive right to distribute the said motion picture "KING OF KINGS" throughout the territories in which [MGM] acquires rights hereunder. . . .

(J.Ex. 1 at R19, R28). Benjamin Melniker, MGM Vice President and General Counsel, testified that "King of Kings" was "a very high cost picture" for MGM (Melniker Deposition, J.Ex. 15 at R283); he recalled the Bronston–MGM deal because of the "amount of money and what we thought was a very extraordinary picture." (Melniker Deposition, J.Ex. 15 at R338).[2]

Melniker further stated that it was MGM's policy to contract for "perpetual," as opposed to limited, distribution rights, and that MGM would not have financed the Picture for less than a perpetual term. (Melniker Deposition, J.Ex. 15 at R339–40) When asked whether Bronston had expressed a desire to limit the distribution rights to less than a perpetual term, he answered:

Absolutely not. We would never have continued the negotiation if that happened. . . . There was no mention of any shorter term of distribution than perpetual. It was understood from the very—it was agreed to from the beginning, and the whole basis was on that term, perpetual

1. Under the Agreement, MGM would advance up to $4,000,000 for the production of the Picture. (J.Ex. 1 at R9) MGM also obtained an option to acquire the distribution rights in certain territories for payment of an additional $1,000,000; MGM exercised this option on December 2, 1960. (J.Ex. 3 at R170).

2. Melniker is the only individual known by the parties to be available to testify and who has personal knowledge of the circumstances surrounding the Basic Agreement. (Statement of Stipulated Facts and Documents for Trial on Stipulated Facts, August 17, 1994, ¶ A.16).

term of distribution. Nobody brought up anything to the contrary.

(Melniker Deposition, J.Ex. 15 at R340).

The Picture was first exhibited on or about October 30, 1961. (Statement of Stipulated Facts and Documents for Trial on Stipulated Facts, August 17, 1994, ¶ A.13) (hereinafter "Stip."). On October 15, 1962 the Copyright Office approved an application to register the copyright of the Picture. (Pl.Ex. 23 at R569–70).

The parties before this Court are successors in interest to the rights and obligations of Bronston and MGM. As a result of a 1967 bankruptcy proceeding, Bronston assigned its interests in the Basic Agreement and the copyright of the Picture to plaintiff P.C. Films. (Stip. ¶ A.14, Pl.Ex. 30 at R592–97). Through a series of mergers and name changes, defendant Turner is the successor to MGM's distribution license, which it continues to exercise. (Stip. ¶ A.24). Defendant Warner Home Video is distributing the Picture in home video pursuant to licenses obtained from Turner. (Stip. ¶ A.15).

P.C. Film renewed the copyright effective December 18, 1989. (Pl.Ex. 36 at R658). In September, 1990 P.C. Films advised the defendants that, in its view, the distribution license had terminated December 31, 1989. (Complaint, Ex. I).

On March 7, 1991, P.C. Films filed this suit. While the Complaint sets forth six claims for relief, the parties have agreed to proceed by a trial on stipulated facts on the first claim only, which seeks a declaratory judgment that (i) the distribution license granted in the Basic Agreement terminated on December 31, 1989, and (ii) defendants have no further distribution rights with respect to the Picture.[3]

## DISCUSSION

The gravamen of plaintiff's claim is that defendants' "perpetual" distribution rights given "in perpetuity" endure, in fact, for only 28 years—the Picture's initial federal statuto-ry copyright term. Any other interpretation, according to plaintiff, would be violative of the U.S. Constitution, Art. I, § 8, the Copyright Act of 1909 ("the Copyright Act"),[4] Supreme Court precedent, New York law, and public policy.

In support of its argument, plaintiff recites the principles that Congressional copyright protection is necessarily limited in nature, and that a copyright proprietor can only contract with respect to what it owns. As applied, plaintiff's argument misconstrues both the nature of licenses related to copyrights, and judicial treatment of such contractual arrangements.

The essence of plaintiff's argument lies in the contention that the Copyright Act should preempt basic contract principles in the interpretation of the Basic Agreement's distribution rights license. This Court finds, however, that the private agreement between two parties—which does not affect the movement of the Picture into the public domain once the initial and renewal terms have expired—does not "alter rights granted by the copyright statutes as to invade the scope of copyright law or violate its policies." *Fantastic Fakes v. Pickwick International, Inc.,* 661 F.2d 479, 483 (5th Cir.1981) (citing *Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150, 153 (2d Cir.), *cert. denied* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968) and *Kingsrow Enterprises, Inc. v. Metromedia, Inc.,* 397 F.Supp. 879, 881 (S.D.N.Y.1975)). *See also Bartsch,* 391 F.2d at 153 ("The development of a 'federal common law' of contracts is justified only when required by a distinctive national policy and ... the general interest that copyrights, like all other forms of property, should be enjoyed by their true owner is not enough to meet this test." (citations omitted)).

Plaintiff has not pointed to, and this Court has not found, any case holding that a contract *expressly* providing for a perpetual license incident to a copyright must be limited to the initial term of the copyright. Rather,

---

3. The remaining claims include copyright infringement, unfair trade practice, wrongful possession, and failure to provide an accounting.

4. 35 Stat. 1075. In 1947, the Copyright Act was codified as 17 U.S.C. § 1 *et seq.* 61 Stat. 652. In 1976, Title 17 was revised in its entirety. 90 Stat. 2541.

plaintiff cites precedent dictating only that where a contract is silent as to the duration of licensed rights, such rights continue until the expiration of the initial copyright term. In *April Productions v. G. Schirmer*, 308 N.Y. 366, 375, 126 N.E.2d 283 (1955), plaintiff's main authority, the original license at issue stated no specific duration. The court held that a contract to pay royalties could not, *in the absence of express language,* be construed to require payment after the expiration of the underlying copyrights.[5]

In strong contrast, there exists a stream of cases involving perpetual license rights in which courts interpreting such licenses have not even discussed whether any constitutional limitations inhere from the Copyright Clause of the Constitution. Speaking in terms of contractual intent, courts routinely recognize the right to enter into perpetual licenses incident to copyrighted material. *See DIC Animation City, Inc. v. McNaught Syndicate, Inc.,* 1993 WL 77377, \*1 (S.D.N.Y. March 15, 1993) (analyzing license for perpetual merchandising rights in cartoon); *Brown v. Twentieth Century Fox Film Corp.,* 799 F.Supp. 166, 168 (D.D.C.1992) (perpetual license to reproduce entertainer's television performance), *aff'd* 15 F.3d 1159 (D.C.Cir.1994); *Rooney v. Columbia Pictures Industries, Inc.,* 538 F.Supp. 211, 214 (S.D.N.Y.) (perpetual license to photograph and reproduce actor's appearances and likeness), *aff'd* 714 F.2d 117 (2d Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983); *General Mills, Inc. v. Filmtel International Corporation,* 195 A.D.2d 251, 599 N.Y.S.2d 820, 821 (1993)

(license for perpetual exhibition rights for an animated cartoon series); *Tele–Pac, Inc. v. Grainger,* 146 Misc.2d 1088, 552 N.Y.S.2d 550, 551 (Sup.Ct.1990) (license granting perpetual distribution rights of film) *rev'd on other grounds,* 168 A.D.2d 11, 570 N.Y.S.2d 521 (1991); *Two Star Films, Inc. v. Movietonews, Inc.,* 71 A.D.2d 989, 420 N.Y.S.2d 30, 30 (1979) (license to distribute series of 39 films in perpetuity).[6]

Moreover, giving effect to perpetual license rights—beyond the initial copyright term—does no harm to copyright principles that seek to protect the public's interest in copyrighted material after the statutorily granted monopoly period. In *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 255–56, 66 S.Ct. 101, 104–05, 90 L.Ed. 47 (1945), the Supreme Court explained the rationale behind patent (and, analogously, copyright) grants:

> By the patent laws Congress has given to the inventor opportunity to secure the material rewards for his invention for a limited time, on condition that he make full disclosure for the benefit of the public of the manner of making and using the invention, and that upon the expiration of the patent the public be left free to use the invention.... [T]he means adopted by Congress of promoting the progress of science and the arts is the limited grant of the patent monopoly in return for the full disclosure of the patented invention and its dedication to the public on the expiration of the patent....

---

**5.** Similarly, in *Warner–Lambert Pharm. Co. v. John J. Reynolds, Inc.,* 178 F.Supp. 655, 664 (S.D.N.Y.1959), *aff'd* 280 F.2d 197 (2d Cir.1960), the court merely repeated the law of *Schirmer:* "[A] license agreement under a patent or copyright, *in the absence of express language to the contrary,* is construed to require the payment of royalties only until the expiration of the underlying grant. (emphasis added)" The court explained this rule in terms of contractual intent—not constitutional limitations—stating that "[s]uch a construction of the license is in all likelihood in accord with the unexpressed or imperfectly expressed intention of the parties." The court concluded that "when parties agree upon a license under a patent or copyright the court will assume, in the absence of express language to the contrary, that their actual inten-

tion as to the term is measured by the definite term of the underlying grant fixed by statute." *Warner–Lambert,* 178 F.Supp. at 664.

**6.** The leading treatise on copyright, cited liberally by the parties, counsels no differently: "[T]he vast bulk of copyright contractual issues must be resolved under state law, given the silence of the Copyright Act in addressing such issues as ... how to construe ambiguous contractual language." 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 1.01[B][3][a] (1992). The treatise continues: "Principles of contract law are generally applicable in the construction of copyright assignments, licenses and other transfers of rights." 3 *Nimmer on Copyright* § 10.08.

The public has invested in such free use by the grant of a monopoly to the patentee for a limited time. Hence any attempted reservation or continuation ... of the patent monopoly, after the patent expires ... runs counter to the policy and purpose of the patent laws.

*Scott Paper*, 326 U.S. at 256, 66 S.Ct. at 104. Similarly, in *Brulotte v. Thys Company*, 379 U.S. 29, 32–33, 85 S.Ct. 176, 179–80, 13 L.Ed.2d 99 (1965), the Supreme Court declared that a patent royalty agreement projecting beyond the patent's expiration date is unlawful *per se* because "the free market visualized for the post-expiration period would be subject to monopoly influences that have no proper place there." Again, the Court emphasized the public domain: "The exaction of royalties for use of a machine after the patent has expired is an assertion of monopoly power in the post-expiration period when, as we have seen, the patent has entered the public domain." *Brulotte*, 379 U.S. at 33, 85 S.Ct. at 179–80.

In strong contrast, defendants seek no such unlawful extension of copyright monopoly through exercise of their distribution rights. P.C. Films renewed its copyright; as such, defendants continue to exercise their license during the statutorily granted period. More importantly, the Basic Agreement is merely a contract between two private parties, under which plaintiff promises that its distribution of the Picture will be exclusively through defendants. The contract neither affects the process through which the Picture will fall into the public domain at the expiration of the renewal term, nor prevents others from distributing the Picture at that time. At that point, rather, the Basic Agreement will remain what it has always been—a distribution agreement between plaintiff and defendants, enforceable between the parties. Defendants do not contend otherwise.

Clearly, a copyright is different from a distribution license. The Copyright Act of 1909 itself implicitly made this distinction. Under the act, a copyright was an indivisible "bundle of rights," incapable of assignments in parts. *Goldwyn Pictures Corp. v. Howells Sales Co.*, 282 F. 9, 11 (2d Cir.1922); *First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*, 286 F.Supp. 295, 298 (S.D.N.Y.1968). A transfer of anything less was a mere "license," not an assignment of the copyright itself. *Misbourne Pictures Ltd. v. Johnson*, 90 F.Supp. 978, 981 (S.D.N.Y.1950) *aff'd*, 189 F.2d 774 (2d Cir. 1951). Accordingly, analysis of a copyright's duration should not necessarily apply when considering the duration of a distribution license.

Plaintiff attempts to resuscitate its case with a discussion of renewal rights. In this regard, plaintiff points to a well-established presumption against finding a conveyance of rights for the renewal period. *See Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679, 684 (2d Cir.1993). Plaintiff then asserts that defendants' distribution rights do not extend beyond the initial copyright term because defendants did not specifically include the phrase "renewal term" in relevant Basic Agreement provisions pertaining to these rights.

Courts, however, do not require inclusion of the precise phrase "renewal term" to find conveyance of rights beyond the initial term. For example, in *Siegel v. National Periodical Publications, Inc.*, 364 F.Supp. 1032, 1037 (S.D.N.Y.1973), *aff'd* 508 F.2d 909 (2d Cir. 1974), the court found that an instrument granting the exclusive right to use "forever" the characters and story of the Superman comic strip impliedly included rights in the renewal period.[7] *See also Epoch Producing Corp. v. Killiam Shows, Inc.*, 522 F.2d 737, 747 (2d Cir.1975) (when "there is no specific reference in [the] assignment to the renewal term ... [t]his deficiency has generally been held as a matter of law, *absent contrary evidence*, to preclude a holding that a transfer of renewal rights was intended." (emphasis added)), *cert. denied* 424 U.S. 955, 96

---

**7.** Tellingly, judicial discussion of renewal rights has hinged on contractual intent, and not on limitations inherent in the Copyright Clause. *See, e.g., Venus Music Corp. v. Mills Music, Inc.*,

261 F.2d 577 (2d Cir.1958); *Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co.*, 255 F.2d 518 (2d Cir.1958), *cert. denied* 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958).

S.Ct. 1429, 47 L.Ed.2d 360 (1976).[8]

With these legal principles in mind, this Court now considers the contractual arrangement in this case. The Basic Agreement sets forth the duration of the licensed distribution rights—they are "perpetual," and are given "in perpetuity." These terms are unambiguous and convey a plain, ordinary meaning. Perpetual means forever. *See Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992) (a written contract "is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed"); *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989) (contract terms should be given their plain and ordinary meaning). Thus, this Court finds that the parties to the Basic Agreement intended for the instrument to convey perpetual distribution rights, i.e. rights that last forever.

Even assuming some ambiguity could be found in the straight-forward terms "perpetual" and "in perpetuity," Melniker's deposition—cited liberally by defendants *and* plaintiff—lays the issue to rest. *See Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993) (where contractual language is ambiguous, parties may submit extrinsic evidence of parties' intent as an aid to construe contractual language); *State v. Home Indem. Co.*, 66 N.Y.2d 669, 495 N.Y.S.2d 969, 971, 486 N.E.2d 827, 829 (1985) (same). The testimony elaborates the meaning of these terms as intended by the negotiating parties:

Q  In your understanding, does the term "perpetual" mean forever?

A  Yes, it does.

Q  In your understanding, when did the perpetual term end?

A  It doesn't end. We have that picture.

Q  Would it be for 30 years?

A  It would be forever.

Q  A hundred years?

\*   \*   \*   \*   \*   \*

A  Forever.

(Melniker Deposition, J.Ex. 15 at R294) Moreover, Melniker's statements indicate that discussion pertaining to distribution rights occurred separately from that regarding the underlying copyright retained by Bronston. (Melniker Deposition, J.Ex. 15 at R344–45).

Accordingly, this Court finds that the Basic Agreement's contractual language is both plain and unambiguous in its provision of perpetual distribution rights. Even if this Court were to find an ambiguity, Melniker's testimony reaffirms that the parties intended to convey perpetual rights.

Finally, this Court notes that any other result reached would work an injustice not only to the parties, but more generally to those contracting in the film distribution and financing industry. Plaintiff's suit seeks termination of a contract that is standard in the industry, under which it is bound by assignment. For example, the *Entertainment Industry Contracts Negotiating and Drafting Guide* advises that a party drafting a film production-financing/distribution agreement should "specify Territory and Term, *e.g.* the world and in perpetuity." The Guide further advises that "distribution rights can be treated distinctly from the copyright ownership in the picture," and that "[i]n a commonly-used arrangement ... the financier/distributor will want the sole and exclusive right to distribute the picture by any and all media throughout the world in perpetuity." 1 Donald Farber, *Entertainment Industry Contracts* 15–51 (1994). *See also* Renee Harmon, *The Beginning Filmmaker's Business Guide: Financial, Legal, Marketing, and Distribution Rights of Making Movies* 89 (stating that distribution period for distribution agreement is "usually perpetuity"); John W. Cones, *Film Finance & Distribution* 147 (defining distribution agreement as "the contract between a film's producer and its distributor through which the distributor commits to distribute the film ... for a set period of time (sometimes in perpetuity)").

---

8.  This result is consistent with the approach outlined in *Nimmer on Copyright*: "[I]t cannot be stated that no language short of express mention of renewals or extensions will be effective to convey renewal rights. It is the intention of the parties as derived from their written language and, where admissible, extrinsic evidence, which controls." 2 *Nimmer on Copyright* § 9.06[A].

Plaintiff's argument would call such standard contracts into question, undercutting normal commercial transactions in the film industry.

## CONCLUSION

For the reasons stated above, this Court determines that defendants' distribution rights were not coterminous with the Picture's initial copyright term. As such, this Court finds for defendants, and denies plaintiff's request for declaratory relief. The Clerk is directed to enter judgment accordingly.