138 F.3d 453
 1998 Copr.L.Dec. P 27,742, 45 U.S.P.Q.2d 1850
 P.C. FILMS CORP., Plaintiff-Counter-Defendant-Appellant,
v.
MGM/UA HOME VIDEO INC., MGM/UA Communications Co., Warner
Home Video, Inc., Turner Entertainment Co.,
Defendants-Counter-Claimants-Appellees.
 No. 97-7399.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 26, 1997.
Decided Feb. 23, 1998.
 
 Carl I. Kaminsky, New York City (Richard L. Yellen, of counsel), for Plaintiff-Appellant.
 Stephen F. Huff, New York City (Tom J. Ferber, Paige A. Moore, Gary R. Kline, Pryor, Cashman, Sherman & Flynn, New York City, of counsel), for Defendants-Appellees.
 Before ALTIMARI, PARKER and KEITH,* Circuit Judges.
 PARKER, Circuit Judge:
 
 
 1
 Plaintiff-appellant P.C. Films Corp. ("P.C. Films") appeals from a judgment of the United States District Court for the Southern District of New York (Barbara S. Jones, Judge ) denying P.C. Films' request for declaratory judgment that a grant of a "perpetual and exclusive right to distribute" the motion picture "King of Kings" terminated upon the expiration of the initial copyright term of the picture. P.C. Films' claim for declaratory relief was the first of six in its complaint filed in 1991, but the parties agreed to proceed by a bench trial on stipulated facts as to the first claim only. The remaining claims--including copyright infringement, unfair trade practice, wrongful possession, and failure to provide an accounting--were subsequently dismissed by the district court in accordance with its opinion on the declaratory judgment claim. A final judgment was entered accordingly. For the reasons stated below, we affirm.I. BACKGROUND
 
 
 2
 The Film "King of Kings" ("Film") was based on a screenplay written by Philip Yordan for Samuel Bronston Productions, Inc. ("Bronston") as a "work made for hire." In 1960, Bronston sought financing for the Film in exchange for which it would license distribution rights in the Film. On August 4, 1960, following months of negotiations conducted by sophisticated and expert parties, each represented by counsel, Bronston and Metro-Goldwyn-Mayer Inc. ("MGM") entered into an agreement ("Basic Agreement") for the production, financing and distribution of the Film.
 
 
 3
 The Film was first exhibited on October 20, 1960. Plaintiff P.C. Films is Bronston's assignee in bankruptcy, as a result of a 1967 bankruptcy proceeding in which Bronston assigned its interests in the Basic Agreement and the copyright in the Film to P.C. Films. Through a series of mergers and name changes, Turner Entertainment Co. ("Turner") is the successor in interest to MGM. Turner continues to exercise distribution rights in the Film. Warner Home Video, another named defendant in the action, is distributing the Film in home video pursuant to licenses obtained from Turner.
 
 
 4
 Pursuant to the terms of the Basic Agreement, MGM provided promissory notes to finance $5 million of the Film's total production budget (which was then approximately $6 million, although it later increased),[1] in return for which MGM received the exclusive right to distribute the Film worldwide, except in certain countries:
 
 
 5
 8. ... subject to the provisions of paragraph 11 below, [MGM] shall retain in perpetuity the exclusive right to distribute the said motion picture throughout the world except in Spain, Portugal, Germany, France, Belgium, Holland and Luxembourg....[2]
 
 
 6
 ....
 
 
 7
 11. ... [MGM] shall be vested with the perpetual and exclusive right to distribute the said motion picture "KING OF KINGS" throughout the territories in which [MGM] acquire[s] rights hereunder....
 
 
 8
 According to Exhibit I of the Basic Agreement, MGM was granted "the sole and exclusive right and license, under copyright and other protection" to distribute the Film, and was granted various other incidental rights with respect to the Film, including the right to exhibit, exploit, market and televise the Film, to use the negative and soundtrack from the Film for the purpose of advertising the Film, and to "exercise all rights, licenses and powers of every kind which [Bronston] has acquired or may acquire in or with respect to the literary, dramatic and/or musical material." MGM was also granted a derivative right to create elements to promote the Film and the right to make copies. Bronston was to own the negative and other physical materials to the Film. Bronston retained all rights to the music soundtrack, the exclusive right to the novelization of the Film and, subject to MGM's written approval, the right to make a sequel. MGM also agreed that if it was not distributing the Film in a particular country after 21 years following MGM's general release of the Film or 24 years from the date of the Agreement, whichever came first, Bronston had the right to negotiate for the release of the Film by some other distributor, provided MGM was first notified of Bronston's intention and given a reasonable time to undertake the distribution itself.
 
 
 9
 The Basic Agreement states, and Turner does not contest, that Bronston is the sole proprietor of the copyright in the Film. MGM was granted the "authority and power of attorney to assert, prosecute, handle and settle" all claims against any person "for the unauthorized or illegal use, copying, reproduction, release, distribution, exhibition or performance" of the Film. As to registration of the copyright in the Film, Bronston was required to "place a proper copyright notice in the main title of the photoplay, in conformity with the laws of the United States governing the form and content of copyright notices, designating [Bronston] as the copyright proprietor." The same section provided that MGM:
 
 
 10
 shall take such steps, if any, with regard to the registration of the copyright in the United States Copyright Office (in the name of [Bronston] as copyright proprietor) as it normally and customarily takes with respect to its own photoplays.
 
 
 11
 The Film was registered in 1962 as a copyrighted work under the Copyright Act of 1909. The application to register the copyright, filed with the copyright office on October 15, 1962, was signed by MGM in the name of Bronston and MGM as co-claimants. Benjamin Melniker, MGM Vice President and General Counsel, who took the lead in the negotiations of the Basic Agreement in 1960, testified in a deposition in this case that MGM's name was added to the initial registration to enable it to register and hold the copyright in trust for Bronston. According to Melniker, this was done so that Bronston could take advantage of an arrangement MGM had with the copyright office which facilitated the process of depositing copies with the copyright office.
 
 
 12
 There was no provision specifically requiring Bronston to register the Film for the renewal term. Nor did MGM receive a power of attorney to renew the copyright. Nevertheless, on October 25, 1989, Turner registered the renewal copyright in the names of Bronston and Turner as co-claimants as MGM had done for the original copyright registration. On December 18, 1989, P.C. Films filed a second renewal application, naming P.C. Films as the sole copyright claimant. The parties agree that, as a work originally registered under the Copyright Act of 1909, the renewal period in the Film does not expire until after 2036. See 17 U.S.C. § 304(a).
 
 
 13
 Against this background, P.C. Films appeals the district court's refusal to declare that the distribution license and other rights created by the Basic Agreement terminated in 1989, upon expiration of the initial copyright term of "King of Kings."
 
 II. DISCUSSION
 A. The Nature of the Distribution License
 
 14
 Under the Copyright Act of 1909, a transfer of anything less than the totality of rights commanded by copyright was automatically a license rather than an assignment the copyright. See 3 Nimmer on Copyright § 10.01[A], at 10-5-10-6. The Basic Agreement expressly provides that Bronston retained legal title in the Film, that is, remained the copyright proprietor. Bronston granted to MGM one of the most significant of its copyright rights in the Film, namely the right to distribute, as well as various other incidental rights, while retaining other copyright rights, such as novelization and sequelization rights. The Basic Agreement is, and was clearly intended to be, an exclusive license. Moreover, it is a license of federal copyright rights. Not only was registration of the Film with the United States Copyright Office required pursuant to the terms of the Basic Agreement, but MGM acquired copyright rights which it could protect through copyright infringement actions because it had the power of attorney to bring such actions, thereby giving MGM the full protection afforded by the federal copyright laws. As a license of federal copyright rights, the Basic Agreement was subject to the provisions, principles and policies of federal copyright law.
 
 B. A License of the Renewal Term
 
 15
 One of the central concepts of federal copyright law is that the renewal period is not merely an extension of the original copyright term but a "new estate ... clear of all rights, interests or licenses granted under the original copyright." G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469, 471 (2d Cir.), cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951). As explained by the United States Supreme Court, the purpose of the right of renewal is to "provide[ ] authors a second opportunity to obtain remuneration for their works." Stewart v. Abend, 495 U.S. 207, 217, 110 S.Ct. 1750, 1758, 109 L.Ed.2d 184 (1990).
 
 
 16
 Although it arguably follows as a matter of logic that if the purpose of the "new estate" concept is to permit authors, "originally in a poor bargaining position, to renegotiate the terms of the grant once the value of the work has been tested," Stewart, 495 U.S. at 218-19, 110 S.Ct. at 1759, a copyright holder should never be able to convey rights in the renewal term until that term commences, this has never been the case. The Supreme Court has consistently allowed authors to assign their rights in the renewal term before that term commences. See, e.g., Miller Music Corp. v. Charles N. Daniels, Inc., 362 U.S. 373, 375, 80 S.Ct. 792, 794, 4 L.Ed.2d 804 (1960); Stewart, 495 U.S. at 215, 110 S.Ct. at 1757. This Circuit has followed suit. See, e.g., Corcovado Music Corp. v. Hollis Music, Inc., 981 F.2d 679 (2d Cir.1993). In so doing, we have reconciled the position of allowing authors to convey rights in the renewal term with the goal of protecting them from exploitation by creating a presumption against the conveyance of renewal rights. Id. at 684 ("[T]here is a strong presumption against the conveyance of renewal rights.... [This presumption] serves the congressional purpose of protecting authors' entitlement to receive new rights in the 28th year of the original term.")
 
 
 17
 We have held that the general presumption against the conveyance of renewal rights may be rebutted where the author includes "language which expressly grants rights in 'renewals of copyright' or 'extensions of copyright.' " Id. (quoting 2 Nimmer on Copyright § 906[A], at 9-71 to 9-72). Further, "general words of assignment can include renewal rights if the parties had so intended." Siegel v. National Periodical Pubs., Inc., 508 F.2d 909, 913 (2d Cir.1974) (holding that the words "forever" and "hereafter" embraced the renewal term). See also Corcovado Music Corp., 981 F.2d at 684-85 (finding no assignment of renewal rights). The intention to convey renewal rights may also be supported by extrinsic evidence. See, e.g., Venus Music Corp. v. Mills Music, Inc., 261 F.2d 577, 578-79 (2d Cir.1958).
 
 
 18
 The Basic Agreement does not expressly refer to rights in the renewal period. However, the Basic Agreement granted MGM the "perpetual and exclusive right to distribute" the Film. The dictionary definition of "perpetual" includes "continuing forever." See Webster's Third New International Dictionary 1684 (1981). Thus, "perpetual" is sufficiently synonymous with "forever" as to make Siegel controlling precedent. Even if Siegel were not controlling, the conclusion that the parties in this case intended to convey rights in the renewal term is supported by extrinsic evidence, namely the testimony of the sole surviving participant in the negotiations, MGM's Vice President and General Counsel, Benjamin Melniker. Melniker, whose deposition was part of the stipulated facts on which plaintiff's declaratory judgment claim was tried and whose testimony was not contradicted, testified that MGM would not have financed the picture for less than a perpetual term and that, in his understanding, the term "perpetual" meant forever, was not limited to any specific term of years, and was not coterminous with the initial copyright term.
 
 
 19
 It is true that the Basic Agreement does not impose any specific obligation on Bronston to renew the copyright, but this oversight may be explained by the fact that MGM believed it could register the copyright renewal for Bronston and MGM as co-claimants, as it did with the initial copyright registration, two years after the Basic Agreement was signed. Moreover, as Turner argued on appeal, it was the realistic commercial expectation of the parties that Bronston would seek to renew the copyright in the Film, otherwise Bronston would lose any federal copyright protection for any of the rights it retained by virtue of the Film falling into the public domain.[3]
 
 
 20
 Plaintiff argues that a grant of a perpetual copyright license is contrary to federal copyright law and policy, which grants a statutory monopoly for a limited duration only, and therefore the Basic Agreement's provisions regarding duration are void as against public policy. Plaintiff contends that the offending provisions should be removed from the contract and this Court should read the Basic Agreement as containing no provision regarding duration at all. Under copyright law, where a contract is silent as to the duration of the grant of copyright rights, the contract is read to convey rights for the initial copyright period only. See 3 Nimmer on Copyright § 10.10[F], at 10-98.
 
 
 21
 As explained below, we decline to decide whether a grant of "perpetual" copyright rights, that is, rights beyond the renewal period, is contrary to copyright law and policy. Even if such a grant is "void," however, we would not adopt plaintiff's analysis which would require the Court to ignore the manifestation of the parties' intention on the issue of duration. Instead, applying the principle of contractual interpretation that when a contract "may be performed lawfully, as well as in violation of the law, it is valid, ... [and the] construction of a contract should be, when it is possible, in favor of its legality," Shedlinsky v. Budweiser Brewing Co., 163 N.Y. 437, 439, 57 N.E. 620, 620 (1900), the Basic Agreement can be lawfully interpreted to continue through the renewal period, thereby giving effect to the intention of the parties to the greatest extent possible consistent with the law.
 
 C. A License Beyond the Renewal Term
 
 22
 The question as to whether a copyright proprietor may, consistent with federal copyright law and policy, license his or her copyright rights beyond the renewal term is one which has not been addressed by this Court.[4] The district court held that the Basic Agreement was "merely a contract between two private parties" and that contract "neither affect[ed] the process through which the Picture [would] fall into the public domain at the expiration of the renewal term, nor prevent[ed] others from distributing the Picture at that time." P.C. Films Corp., 954 F.Supp. at 715. We are not convinced that this analysis gives sufficient weight to federal copyright law and the constitutional principle that a grant of copyright rights can be for "limited Times" only. See U.S. Const. Art. I, § 8, cl. 8. However, we believe it is premature and therefore inappropriate at this time to decide whether a contract purporting to grant a perpetual license of copyright rights, that is, rights that endure beyond the renewal period, is contrary to federal copyright law and policy. We need not resolve that issue because the renewal term for the film "King of Kings" does not expire until after 2036. We have held that the Basic Agreement's grant of distribution rights "in perpetuity" permits the defendants to continue to exercise their distribution rights through the renewal period. Thereafter, the work will go into the public domain. We decline to decide whether the Basic Agreement imposes restrictions on P.C. Films beyond the renewal period.
 
 III. CONCLUSION
 
 23
 For the foregoing reasons, we affirm the decision of the district court denying plaintiff's request for declaratory relief and affirm the court's dismissal of plaintiff's remaining claims on the same basis.
 
 
 
 *
 The Honorable Damon J. Keith, of the United States Court of Appeals for the Sixth Circuit, sitting by designation
 
 
 [1]
 By a complicated formula in § 8 of the Basic Agreement, MGM was to recoup its advances and certain other fees and expenses from the gross receipts collected by MGM from distribution of the Film, and after recoupment, MGM agreed to pay 60% of "net profits" to Bronston. To date, the Film has not generated sufficient revenue for Bronston or its successors to receive any monies under this provision
 
 
 [2]
 Prior to the execution of the Basic Agreement, Bronston had assigned the distribution rights in the motion picture for Germany, France, Belgium, Holland and Luxembourg to Nazareth Production Company ("Nazareth"), a party to the Basic Agreement. Pursuant to § 9 of the Basic Agreement, MGM was given the option to acquire for $1 million the exclusive right to distribute the Film in the countries reserved to Nazareth, an option which MGM exercised on December 2, 1960. Accordingly, by the end of 1960, MGM had "perpetual" distribution rights in the Film for the entire world except Spain and Portugal
 
 
 [3]
 If it failed to renew, Bronston would also have had little prospect of negotiating a new distribution agreement in the event that MGM declined to continue distributing the Film after 21 years from the Film's general release or 24 years from the date of the Basic Agreement, because it would be unable to provide an exclusive distribution license with federal copyright protection once the initial term expired
 
 
 [4]
 The district court noted that several district courts and New York state courts have considered contracts granting "perpetual" licenses. P.C. Films Corp. v. Turner Entertainment Co., 954 F.Supp. 711, 714 (S.D.N.Y.1997). However, in none of those cases did the courts consider whether a grant of copyright rights in perpetuity is consistent with federal copyright law