**UNITED STATES of America,**
**Plaintiff,**

v.

**Jean MARTIGNON, Defendant.**

**No. 03 Cr. 1287(HB).**

United States District Court,
S.D. New York.

Sept. 24, 2004.

416

David Patton, Federal Defender Services Unit, Legal Aid Society, New York City, for Defendant.

Samidh Guha, Assistant United States Attorney, U.S. Attorney's Office, Criminal Division, New York City, for Plaintiff.

## OPINION & ORDER

BAER, District Judge.[1]

Defendant Jean Martignon ("Martignon") moves pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure ("Fed. R.Crim.P.") to dismiss the one-count Indictment, charging him with a violation of 18 U.S.C. § 2319A ("anti-bootlegging statute" or "statute"). Martignon mounts his challenge on several constitutional grounds—namely that (1) by virtue of its regulation of *live performances* for an *unlimited period of time*, the anti-bootlegging statute exceeds the Copyright Clause's authority to protect the right of artists [2] to their *"Writings"* for *"limited*

---

1. Sonia Wadhwa Nath, a summer 2004 intern in my Chambers and second-year law student at The George Washington University Law School and Graham O'Donoghue, also a summer 2004 intern in my Chambers and second-year law student at Columbia Law School, provided substantial assistance in the research and drafting of this Opinion.

2. The Court acknowledges that it is a matter of debate whether the Copyright Clause's purpose is to protect the *author's* right to his creative work or the *public's* right of access to that work. *See* John D. Shuff & Geoffrey T. Holtz, *Copyright Tensions in a Digital Age*, 34 Akron L.Rev. 555, 556 (2001) ("In any copyright dispute, it becomes readily apparent that the Copyright Clause creates an inherent tension. From the face of the clause, it is clear that the purpose of copyright protection is 'to promote the Progress of Science and useful Arts.' The plaintiff, generally the author of the work at issue, will argue that this purpose can only be realized by conferring strong rights upon the author in order to foster an economic incentive to create copyrightable works in the first place. An individual creator, writer, photographer, artist, musician, or filmmaker will also assert that the clause reflects the Framers' understanding of the author's need to earn a living at his or her craft. By contrast, the defendant, generally the alleged infringer who has copied, distributed, or otherwise made use of the copyrighted work in some way, will argue that science and the arts are promoted by the most widespread public dissemination of works and that the rights attaching to a copyright should be as narrow as possible so that the creator cannot defeat this purpose by withholding the work. Al-

*Times"* (hereinafter "Limited Times") (U.S. Const.Art. I, § 8, cl.8.), (2) the statute violates the free speech protections of the First Amendment, and (3) the statute violates basic tenets of federalism. Because this Court finds that the anti-bootlegging statute is impermissible under the Copyright Clause, and that Congress may not evade the limitations imposed on its power in order to enact intellectual property legislation such as the anti-bootlegging statute through resort to a separate grant of authority (such as the Commerce Clause), defendant's motion is granted, and the Indictment is dismissed.

## I. BACKGROUND

### A. Factual Background

Martignon operates Midnight Records, a record business comprised of a Manhattan store, located on 23rd Street, a catalog service, and an Internet site. The Recording Industry Association of America ("RIAA"), with the support and assistance of law enforcement agencies, initiated an investigation into Martignon's business. Def. Mem. at 5. In September 2003, Martignon was arrested by federal and state law enforcement agents, acting in conjunction with officials from RIAA. Def. Mem. at 5. Martignon "was placed under arrest and, after presentment before the Honorable Magistrate Judge Ronald Ellis, was released on bail." Pl. Opp. at 2. On October 27, 2003, Martignon was indicted by a

federal grand jury for violating § 2319A, for selling "unauthorized recordings of live performances by certain musical artists through his business Midnight Records." Indictment ¶ 1. The one count Indictment provides no further details as to, e.g., the artists that Martignon allegedly bootlegged, the scope of the bootlegging, or the distribution of bootlegged works. On January 15, 2004, Martignon moved to dismiss the Indictment on the basis that the anti-bootlegging statute is unconstitutional. The motion was fully submitted on March 26, 2004, and oral argument was heard on April 1, 2004.

### B. Statutory Framework

■ Prior to 1994 and the enactment of 18 U.S.C. § 2319A, no federal protection existed for the unrecorded live performances of musicians. Federal copyright protection has, however, existed for musical compositions since 1831, *see* 17 U.S.C. § 102(a)(2) (providing that "musical works, including any accompanying words" are protectable subject matter), and for sound recordings since 1971, *see* Sound Recording Act of 1971, Pub.L. No. 92–140, 85 Stat. 391 (amending Title 17 of the United States Code "for the purpose of protecting against unauthorized duplication and piracy[3] of sound recordings"); 17 U.S.C. § 102(a)(7) (including "sound recordings" as a category of protected "works of authorship"). Still no federal protection extended to unrecorded live performances,

---

most any party in a copyright lawsuit will, at some point, cite this clause and embrace it triumphantly as his or her own."). Because the difference between either rationale and a commerce-driven theory is obvious, resolution of this question is immaterial here. The Court's focus here is on the protection of the artist, rather than the public, and is driven solely by the anti-bootlegging statute's language, and should not be interpreted as a suggestion of this Court's view on the colloquy.

3. "Piracy" is distinct from "bootlegging." Whereas "piracy" refers to the duplication of a sound recording that has already been commercially released, "bootlegging" involves the duplication of a commercially unreleased performance. *United States v. Moghadam,* 175 F.3d 1269, 1271 n. 3 (1999) (citing *Dowling v. United States,* 473 U.S. 207, 209 n. 2, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985)).

and the duplication of such performances (i.e."bootlegging"). Anti-bootlegging measures, however, were prevalent at the state level prior to 1994.[4] This apparent gap in copyright protection prompted Congress to enact the anti-bootlegging statute, a measure that would protect performers from the unauthorized duplication of their live performances. *See generally United States v. Moghadam,* 175 F.3d 1269, 1272 (11th Cir.1999) (identifying growing market for bootleg copies of live performances as an additional factor spurring Congressional action).

The enactment of the anti-bootlegging statute grew out of the Uruguay Round of trade negotiations under the General Agreements on Tariffs and Trade ("GATT"). In April 1994, 111 nations signed the Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations, and in so doing adopted the Agreement on Trade–Related Aspects of Intellectual Property Rights ("TRIPs"). *See* Agreement on Trade–Related Aspects of Intellectual Property Rights, Apr. 15, 1994, WTO Agreement, Annex 1C, Legal Instruments—Results of the Uruguay Round vol. 1 (1994), 33 I.L.M. 1125, 1197 (1994). The United States was a driving force behind the adoption of TRIPs, which has been described as "the highest expression to date of binding intellectual property law in the international arena." David Nimmer, *The End of Copyright,* 48 Vand. L.Rev. 1385, 1391–92 (1995). In the United States, TRIPs became law with Congressional approval of the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809 (1994). The United States fulfilled its obligation under TRIPs by enacting 18 U.S.C. § 2319A (2002) (codifying § 513 of the URAA, 108 Stat. at 4975), which pro-

vides the criminal sanction for bootlegging as follows:

(a) Offense.—Whoever, without the consent of the performer or performers involved, knowingly and for purposes of commercial advantage or private financial gain—

(1) fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation;

(2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance; or

(3) distributes or offers to distribute, sells or offers to sell, rents or offers to rent, or traffics in any copy or phonorecord fixed as described in paragraph (1), regardless of whether the fixations occurred in the United States; shall be imprisoned for not more than 5 years or fined in the amount set forth in this title, or both ...

The anti-bootlegging statute has a sister provision, not the subject of the dispute here, which establishes civil liability for bootlegging. URAA § 512, 108 Stat. at 4974 (codified by 17 U.S.C. § 1101).

## II. DISCUSSION

This decision analyzes the constitutionality of Congress' enactment of the anti-bootlegging statute. In Part II.A, I discuss a related Eleventh Circuit decision, *United States v. Moghadam,* 175 F.3d 1269, which addresses a similar challenge to the anti-bootlegging statute. Then, in Part II.B, I analyze whether the anti-bootlegging statute falls within the purview of the Copyright Clause. After concluding that it does, I next, in Part II.C, determine whether the anti-bootlegging statute was a

---

4. *See, e.g.,* Fla. Stat. § 540.11(2)(a)(3).

proper exercise of Congress' Copyright Clause powers. Concluding that it was not, because the anti-bootlegging statute violates both the fixation and durational limitations of the Copyright Clause, I turn, in Part II.D, to the difficult question of whether Congress may enact copyright-like legislation under its Commerce Clause authority when that legislation conflicts with express limitations imposed by the Copyright Clause. In this Part, I find that Congress may not. Finally, in Part II.E, adopting *Moghadam's* theory, I alternatively conclude that even if Congress could avoid the limitations of the Copyright Clause by enacting copyright-like legislation under the Commerce Clause, it may not do so when such legislation is "fundamentally inconsistent" with the Copyright Clause's restrictions. Since the anti-bootlegging statute is "fundamentally inconsistent" with the Copyright Clause's prohibition on perpetual regulation, I conclude that the statute also fails on this alternative theory.[5]

### A. *United States v. Moghadam:* A Narrow Holding

The Eleventh Circuit, the only Court that has heard a constitutional challenge to the anti-bootlegging statute, assumed without deciding that Congress *could not have* validly enacted the statute pursuant to its Copyright Clause powers, and then determined that the statute was a constitutional exercise of Congress' Commerce Clause authority. *Moghadam,* 175 F.3d at 1274, 1282. However, the defendant in *Moghadam* did not mount a challenge based on the statute's seemingly perpetual regulation, in defiance of the "Limited Times" provision of the Copyright Clause,

but rather, focused solely on the fact that the statute regulated live musical performances, which were beyond the scope of the Copyright Clause's definition of "Writings." In concluding that the anti-bootlegging statute was not "fundamentally inconsistent" with the Copyright Clause, the Court did not consider the statute's lack of a durational component. And, not only was this issue not present in *Moghadam,* but the *Moghadam* Court all but stated, on several different occasions, that had the defendant challenged the statute's violation of the "Limited Times" provision in the Copyright Clause, the Court may well have come to a different conclusion about the statute's viability. *See Moghadam,* 175 F.3d at 1274, 1281 n. 14, 1281, 1282, *supra,* n. 19. This Court is faced with the broader challenge, envisioned by the *Moghadam* Court, to both the Copyright Clause's fixation and durational limitations.

### B. Anti–Bootlegging Statute As Copyright–Like or Commercial Regulation

■ In order to establish whether the anti-bootlegging statute is constitutional, it is necessary to determine whether the statute is a copyright law or a commercial regulation. It is pretty clear that when Congress enacted the anti-bootlegging statute, it believed that it was acting pursuant to its Copyright Clause powers. Although the government is correct that Congress' belief as to the power under which it enacts a statute is not dispositive, and "[a]n otherwise valid exercise of congressional authority is not, of course, invalidated if Congress happens to recite the wrong clause [of the Constitution] . . . or,

---

5. *Cf. Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 465–66, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

indeed, if Congress recites no clause at all," Laurence H. Tribe, American Constitutional Law 307 n. 6 (2d ed.1988) (citing *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948) ("The question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.")), it is still essential to determine how to classify a statute in order to ensure that it does not run afoul of any express limitations imposed on Congress when regulating in the respective arena. *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 467, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982) (before finding that an Act in question was unconstitutional, the Court first determined that the Act was "an exercise under the Bankruptcy Clause" not "a congressional exercise of power under the Commerce Clause."). If the anti-bootlegging statute is a copyright-like statute, as this Court finds that it is, it will be necessary to determine whether the statute falls within Congress' power to legislate in that field.

■ In order to classify the anti-bootlegging statute, it is necessary to examine both the events surrounding the statute's passage as well as the legislative history. *Ry. Labor Executives' Ass'n*, 455 U.S. at 467, 102 S.Ct. 1169. As discussed *supra*, Part I.B, in 1994, the United States joined 110 other nations to sign the Final Act Embodying the Results of the Uruguay Round of Multilateral Trade Negotiations. This Act was broad and far-reaching, and included TRIPs, under which "all WTO member states are required to extend intellectual property protection to live musical performances." Lee H. Rousso, *The Criminalization of Bootlegging: Unnecessary and Unwise*, 1 Buff. Intell. Prop.

L.J. 169, 185 (2002). TRIPs "has been described as 'the highest expression to date of binding intellectual property law in the international arena.'" *Moghadam*, 175 F.3d at 1272 (citing Nimmer, *supra* Section I.B, at 1391–92). In order to fulfill its obligations under TRIPs, Congress enacted the anti-bootlegging statute as part of the URAA. Rousso, *supra* Section II.B, at 186. While the Treaty under which the anti-bootlegging statute was promulgated addressed various subject matters, TRIPs, the agreement under which the anti-bootlegging statute was enacted, dealt completely with intellectual property.

Further, the wording of the anti-bootlegging statute and its legislative history demonstrate that the statute was an exercise of Congress' Copyright Clause authority. First, a plain reading of the statute makes evident that its purpose is synonymous with that of the Copyright Clause— "the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'" *County of Suffolk v. Experian Info. Solutions, Inc.*, 99 Civ. 8735, 2000 WL 1010262, at *4, 2000 U.S. Dist. LEXIS 10144, at *14–15 (S.D.N.Y. 2000) (citing *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 98 L.Ed. 630 (1954)). The anti-bootlegging statute subjects to criminal penalties "[w]hoever, *without the consent of the performer or performers involved*, knowingly and for purposes of commercial advantage or private financial gain" fixes, transmits, or distributes "the sounds or sounds and images of a live musical performance." 18 U.S.C. § 2319A(a) (emphasis added). The portion of the Senate Report on the URAA[6] that

---

6. The Report includes statements from various Committees, including the Ways and Means, Finance, Agriculture, Nutrition, Forestry, and Governmental Affairs Committees, but the Report concerning the relevant por-

discusses TRIPs comes from the Committee on the Judiciary ("COJ"),[7] and underscores that the purpose of TRIPs was to "ensure that critical enforcement procedures would be available in each member country to safeguard intellectual property rights." S.Rep. No. 103–412, at 224 (1994). Each country, including the United States, then enacted anti-bootlegging legislation. That the anti-bootlegging statute has its roots in an inter-country initiative cannot save the statute; it does not serve to transform what appears on its face to be an intellectual property statute into one whose primary purpose is to regulate commerce. Simply because the purpose of the URAA may have been to "ensure uniform recognition and treatment of intellectual property in international commerce" (*Moghadam*, 175 F.3d at 1276), does not mean that the purpose of each WTO country's legislation has the same purpose domestically.

■ Further, under the subheading of "Copyright Provisions," the COJ discussed the United States' obligation under TRIPs, as a WTO member, "to allow performers to prevent the unauthorized fixation in sound recordings or music videos of their live performances and to prevent the reproduction of such recordings." S.Rep. No. 103–412, at 225. Notably missing from this description of the statute's purpose is any discussion of commerce. Rather, the purpose of the implementing legislation, as expressed, is to protect performers. Finally, in this same description, the COJ goes on to explain that "Section 512 of the bill [the civil provision] amends Title 17 to provide that bootleggers are subject to civil remedies *under the Copyright Act.*" *Id.* (emphasis added). The COJ simply failed to recognize, let alone master, one of the central problems here— that an unrecorded live musical performance is not a writing.[8]

Additionally, Congress' placement of the anti-bootlegging statute in the United States Code, almost as a sub-set of the Copyright Act, reveals the unquestionable link to Copyright. The Copyright Act's section on criminal infringement is codified at 18 U.S.C. § 2319 and the criminal provision of the anti-bootlegging statute is codified directly thereafter, at 18 U.S.C.

---

tion of the URAA stems from the Committee on the Judiciary.

7. "In surveying legislative history [the Supreme Court has] repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represent the considered and collective understanding of those [members of Congress] involved in drafting and studying proposed legislation.'" *Eldred v. Ashcroft*, 537 U.S. 186, 210, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (citing *Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969))).

8. *See* Joseph C. Merschman, Note, *Anchoring Copyright Laws in the Copyright Clause: Halting the Commerce Clause End Run around Limits on Congress's Copyright Power*, 34 Conn. L.Rev. 661, 665 (2002) ("The rights granted under the Copyright Act, collectively codified in Title 17 of the United States Code, apply only to fixed works. Section 102, which prescribes the subject matter of copyright, states that 'copyright protection subsists, in accordance with [Title 17], in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated …' This statutory definition limiting copyright protection to fixed works makes it apparent that the protection of unfixed live musical performances under § 1101 is not copyright protection, although something quite similar. The paradox: Congress constructed a new Chapter 11 and placed it in Title 17 to house rights given to works that do not meet Congress's own definition of works eligible for copyright protection.").

§ 2319A.[9] And, the "Definitions" provision of the anti-bootlegging statute, rather than defining crucial terms, such as "fixed," "musical work," and "sound recordings," adopts the definitions of these terms as stated in Title 17—the Copyright Title. 18 U.S.C. § 2319A(e). While Congress' belief as to the power under which it enacts legislation is immaterial, *see supra,* Part II.B, its placement of a statute provides a valuable window through which to view what Congress believed to be the central thrust of the statute. Therefore, the anti-bootlegging statute's positioning as an offshoot of the Copyright Act supports an interpretation of the statute as one directed at protecting the interest of *artists,* rather than *commerce,* and therefore further sustains the view that the statute is copyright-like in nature.

Finally, even if the anti-bootlegging statute has ancillary benefits to interstate commerce, it is clear that it was enacted primarily to cloak artists with copyright-like protection. This Court does not refute the *Moghadam* Court's finding that bootlegging has a "deleterious economic effect on the recording industry." *Moghadam,* 175 F.3d at 1276. But, this Court does not believe that simply because a piece of legislation has commercial consequences, advantages, or even intentions, the legislation loses its "Copyright" identity and becomes a "Commercial" statute— not subject to the strictures of the Copyright Clause. Further, the criminal arm of the Copyright Act contains the same element that *Moghadam* cited to in the anti-bootlegging statute as proof that the anti-bootlegging statute "necessarily is inter-

twined with commerce"—that the activity have been performed "for purposes of commercial advantage or private financial gain." *Moghadam,* 175 F.3d at 1276 (citing 18 U.S.C. § 2319A(a)); 17 U.S.C. § 506 (criminal infringement of a copyright is found when a person willfully infringes a copyright *"for purposes of commercial advantage or private financial gain"*) (emphasis added). Clearly, the *Moghadam* Court would never have advanced the argument that the Copyright Act is commercial in nature simply because of the mention of commercial advantage or financial gain.

Based on the anti-bootlegging statute's language, history, and placement, it is clearly a copyright-like regulation.

## C. Sustainability of the Anti–Bootlegging Statute Under the Copyright Clause

The government does not argue, and indeed could not establish that Congress was empowered to enact the anti-bootlegging statute under its Copyright Clause powers. The Copyright Clause of the Constitution authorizes Congress "to promote the Progress of Science and the useful Arts,[10] by securing *for limited Times* to Authors and Inventors the exclusive Right to their respective *Writings* and Discoveries." U.S. Const. art. I, § 8, cl. 8 (emphasis added). Hence, the "the Copyright Clause [i]s 'both a grant of power and a limitation.' " *Eldred v. Ashcroft,* 537 U.S. 186, 212, 123 S.Ct. 769, 154 L.Ed.2d 683 (2003) (quoting *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 5, 86 S.Ct. 684,

---

**9.** Although not the subject of this motion, the civil portion of the anti-bootlegging statute is codified at 17 U.S.C. 1101, in Title 17, the Title corresponding to Copyrights.

**10.** "This section of the clause is known as the preamble. It explicitly sets out the legislative

purpose for the power granted, making it the only grant of power in the Constitution to contain a purpose." Patrick Haggerty, The Constitutionality of the Sonny Bono Copyright Term Extension Act of 1998, 70 U. Cin. L.Rev. 651, 664 (2002).

15 L.Ed.2d 545 (1966)); *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 146, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (same). Because the anti-bootlegging statute provides seemingly *perpetual protection* for *unfixed* musical performances, it runs doubly afoul of Congress' authority to regulate under the Copyright Clause.

### 1. *Fixation Requirement*

The government concedes that live musical performances are not "writings," a relatively uncontroversial premise.[11] The anti-bootlegging statute adopts Title 17's (the Copyright Act's) definition for, *inter alia,* the term "fixed," which, the legislative history of the Act explains, exists "if there has been an authorized embodiment in a copy or phonorecord and if that embodiment is sufficiently permanent or stable to permit the work to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." H.R.Rep. No. 94–1476, at 53 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5666 (internal quotations omitted).

■ "While an 'author' may be viewed as an individual who writes an original composition, the term, in its constitutional sense, has been construed to mean an 'originator,' 'he to whom anything owes its origin.' " *Goldstein v. California,* 412 U.S. 546, 561–62, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) (quoting *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 58, 4 S.Ct. 279, 28 L.Ed. 349 (1884)). The category of what constitutes "writings" has expanded

significantly over time. Carole P. Sadler, Comment, *Federal Copyright Protection And State Trade Secret Protection: The Case For Partial Preemption,* 33 Am. U.L.Rev. 667, 699 ("Courts have generally construed the term 'writings' liberally to respond to the artistic and technological advancements of society.") (citing *Goldstein,* 412 U.S. at 562, 93 S.Ct. 2303). Recordings of musical performances are now considered original artistic performances within the Copyright Clause's definition of "writings." *Goldstein,* 412 U.S. at 562, 93 S.Ct. 2303.[12] But, live musical performances of which an artist does not authorize a recording never become fixed.

"If the word 'writings' is to be given any meaning whatsoever, it must, at the very least, denote some material form, capable of identification and having a more or less permanent endurance." Nimmer, *supra* Section I.B, § 1.08[C][2], at 1–66.30 (internal quotations omitted). "Thus, although in the modern era the term 'Writings' allows Congress to extend copyright protection to a great many things, those things have always involved some fixed, tangible and durable form." *Moghadam,* 175 F.3d at 1274 (citing, *inter alia, Goldstein,* 412 U.S. at 561, 93 S.Ct. 2303).

■ While the category of "writings" has expanded over time, it has never moved into the realm of unfixed works. The Framers of the Constitution created a system whereby only fixed works were entitled to Copyright protection, and Congress has honored this interpretation of

---

11. The *Moghadam* Court "assume[s] *arguendo,* without deciding, that [the fact that live musical performances are not in a fixed, tangible and durable form] would preclude the use of the Copyright Clause as a source of Congressional power for the anti-bootlegging statute." *Moghadam,* 175 F.3d at 1274.

12. Copyright protection now exists for: (1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisual works; (7) sound recordings; and (8) architectural works. 17 U.S.C. § 102(a).

"writings" since that time. Merschman, 34 Conn. L.Rev., at 682 (citing *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 57, 4 S.Ct. 279, 28 L.Ed. 349 (1884)). Hence, by virtue of the fact that it regulates unfixed live performances, the anti-bootlegging statute is not within the purview of Congress' Copyright Clause power.[13]

### 2. *Duration Requirement*

 Unlike the Copyright Act, which honors the Copyright Clause's "Limited Times" restriction through an express limitation of copyright protection to "a term consisting of the life of the author and 70 years after the author's death," 17 U.S.C. § 302, the anti-bootlegging statute procures seemingly perpetual protection for performers. *Moghadam,* 175 F.3d at 1274 ("The protection afforded to live performances by § 2319A, however, contains no express time limitation and would arguably persist indefinitely."). It is clear that the "Limited Times" restriction in the Copyright Clause prohibits Congress from granting Copyright protection of perpetual duration. *See Eldred,* 537 U.S. at 210, 123 S.Ct. 769 (holding that the Copyright Term Extension Act ("CTEA"), in extending the duration of federal copyrights by 20 years, did not violate the "Limited Times" restriction of the Copyright Clause because it *"did not create perpetual copyrights."*) (emphasis added).

 The rationale behind this express limitation in Congress' Copyright Clause powers is that "[w]hen Congress grants an exclusive right or monopoly [as it does under the Copyright Clause], its effects are pervasive; no citizen or State may

escape its reach." *Goldstein,* 412 U.S. at 560, 93 S.Ct. 2303. The Limited Times clause is designed to confine this monopoly, and counter-balance the privilege of artists to keep their works from the purview of the public. The "Limited Times" requirement ensures that the public will benefit, albeit at a later date, when the work reaches the public domain. *P.C. Films Corp. v. Turner Entm't Co.,* 954 F.Supp. 711, 715 (S.D.N.Y.1997) (" 'The means adopted by Congress of promoting the progress of science and the arts is the limited grant of the [copyright] monopoly in return for the full disclosure of the [copyrighted] invention and its dedication to the public on the expiration of the [copyright].' " (quoting *Scott Paper Co. v. Marcalus Mfg. Co.,* 326 U.S. 249, 255–56, 66 S.Ct. 101, 90 L.Ed. 47 (1945))). It is undeniable that the anti-bootlegging statute grants seemingly perpetual protection to live musical performances, and therefore would run afoul of the Copyright Clause.

Hence, the anti-bootlegging statute conflicts with two limitations imposed on Congress' power under the Copyright Clause—the fixation and durational terms.

### D. When Copyright Clause Power Conflicts With Commerce Clause Power

### 1. *Congress May Not Do Indirectly What It Is Forbidden To Do Directly*

 In order to give meaning to the express limitations provided in the Copyright Clause, when enacting copyright-like legislation, such as the anti-bootlegging statute, whose purpose is "to promote the Progress of Science and the useful Arts," U.S. Const. art. I, § 8, cl. 8,

---

**13.** While it is arguable that, in enacting the anti-bootlegging statute, Congress intended to alter the concept of "writings" to include unfixed live performances that are capable of fixation, there is no indication in the legislative history to suggest that Congress intended to make such a radical change. Had Congress been altering a two-century long interpretation of the Constitution, it would have at least acknowledged its action.

Congress may not, if the Copyright Clause does not allow for such legislation, enact the law under a separate grant of power, even when that separate grant provides proper authority.[14]

> The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction, between a government with limited and unlimited powers, is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed, are of equal obligation.

*Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 176–77, 2 L.Ed. 60 (1803). Article I Section 8 "enumerates those powers which have been granted to Congress," *Goldstein*, 412 U.S. at 560–61, 93 S.Ct. 2303, among which is the power "to promote the Progress of Science and the useful Arts,"

U.S. Const. art. I, § 8, cl. 8, which is restricted to the subject of "Writings" and requires a durational limitation on any grants. Hence, Congress' power to act in the copyright field is limited by the confines of the Copyright Clause. Congress may not enact copyright-like legislation, such as the anti-bootlegging statute, under the commerce clause (or any other clause),[15] when the legislation conflicts with the limitation[s] imposed by the Copyright Clause.[16]

The Supreme Court's holding and analysis in *Ry. Labor Execs.' Ass'n*, 455 U.S. 457, 102 S.Ct. 1169, is highly instructive here. In *Ry. Labor Execs.' Ass'n*, the Supreme Court struck down the Rock Island Railroad Transition and Employee Assistance Act ("RITA") as repugnant to the limitations imposed by the Bankruptcy Clause, Art. I, § 8, cl. 4, which grants Congress the power to "establish *uniform Laws* on the subject of Bankruptcies throughout the United States." (emphasis added). The Court did so despite the fact that the Commerce Clause could have independently supported the legislation—

---

**14.** Because I find that (1) the anti-bootlegging statute is copyright-like legislation, and (2) Congress may not avoid the express limitation of the Copyright Clause through resort to a separate power, it is unnecessary for this Court to analyze whether the Commerce Clause could have supported the legislation. For purposes of this Opinion, I assume *arguendo*, that the Commerce Clause or the Necessary and Proper Clause could have provided Congress with the requisite authority if the Copyright Clause did not restrict Congress' legislation in this field. *See Moghadam*, 175 F.3d at 1274–77.

**15.** The government argues, alternatively, that Congress could have enacted the anti-bootlegging statute pursuant to its power under the Necessary and Proper Clause (Art. I, § 8, cl.18). We need not address Congress' power under the Necessary and Proper Clause separately as Congress may not enact copyright-like legislation under any clause when such legislation conflicts with an express limitation

(or limitations as the case is here) of the Copyright Clause.

**16.** "When a specific clause of the Constitution, such as Clause 8 of Article I, Section 8, has been construed as containing general limitations on Congress's power, Congress may not avoid those limitations by legislating under another clause." William Patry, *The Enumerated Powers Doctrine and Intellectual Property: An Imminent Constitutional Collision*, 67 Geo. Wash. L.Rev. 359, 361 (1999). "Congress may not … transcend specific limitations on its exercise of the commerce power that are imposed by other provisions of the Constitution." Malla Pollack, *Unconstitutional Incontestability? The Intersection of the Intellectual Property and Commerce Clauses of the Constitution: Beyond A Critique of Shakespeare Co. v. Silstar Corp.*, 18 Seattle Univ. L.R. 259, 270 (1995) (citing *EEOC v. Wyoming*, 460 U.S. 226, 248, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (Stevens, J., concurring)).

due to the link to commerce. The Court first determined, through reference to the statute and its legislative history, as we do here, that RITA was an exercise of Congress' power under the Bankruptcy Clause. *Id.* at 467–68, 102 S.Ct. 1169. Next, the Court found that RITA violated the uniformity requirement inherent in the Bankruptcy Clause because "[b]y its terms, RITA applies to only one regional bankrupt railroad," *id.* at 470, 102 S.Ct. 1169, and "[a] law can hardly be said to be uniform throughout the country if it applies only to one debtor and can be enforced only by the one bankruptcy court having jurisdiction over that debtor," *id.* at 471, 102 S.Ct. 1169. Then, the Court found that because "the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress' power," *id.* at 468, 102 S.Ct. 1169, namely that Congress may only enact "uniform Laws on the subject of Bankruptcies," Art. I, § 8, cl. 4, Congress may not utilize its Commerce Clause authority to bypass this constraint. "If we were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws." *Id.* at 468–69, 102 S.Ct. 1169. The Supreme Court underscored this concept when it wrote that "[t]o hold otherwise would allow Congress to repeal the uniformity requirement from Art. I, § 8, cl. 4, of the Constitution." *Id.* at 473, 102 S.Ct. 1169.

▅▅ The similarities between *Ry. Labor Execs.' Ass'n* and this case are obvious. The Bankruptcy Clause, like the Copyright Clause, limits Congress' power in a particular field, there bankruptcy, here copyright (or copyright-like subjects).[17] The Bankruptcy Clause imposes a restriction of uniformity on Congress' power and the Copyright Clause imposes, *inter alia*, restrictions of fixation and duration on Congress' authority. Just as Congress may not override the Bankruptcy Clause's limitation through reference to the Commerce Clause, Congress may not side-step the Copyright Clause's limitations through legislating under the Commerce Clause.

▅▅ The Commerce Clause is simply an affirmative grant, with no restrictions or limitations. *Ry. Labor Execs.' Ass'n*, 455 U.S. at 468, 102 S.Ct. 1169. There is no question that it provides Congress with broad authority to regulate in the field of commerce. However, in order to give meaning to the Constitution's express restrictions, and to honor the concept of a government with limited powers, the wording of each Clause must be respected. Congress may not, therefore, enact copyright or copyright-like legislation, which conflicts with the fixation or durational limitations of the Copyright Clause, even if another clause provides the basis for such power because Congress' power to enact copyright or copyright-like legislation, "to promote the Progress of Science

---

17. The government argues, circuitously, that because the anti-bootlegging statute regulates a subject matter, live performances, that is not copyrightable—by virtue of the lack of fixation and durational limitation—Congress was not bound by the Copyright Clause's restrictions. I find this argument to be wholly unconvincing. Congress is not bound by the Copyright Clause's limitations when it legislates in an unrelated field and enacts legislation for a purpose other than the one embod-

ied in the Copyright Clause. However, when Congress enacts copyright or copyright-like legislation, for the purpose stated in the Copyright Clause, it is constrained by the Copyright Clause's boundaries. Finding otherwise, as cautioned by *Ry. Labor Execs.' Ass'n*, would grant Congress the ability "to repeal the [fixation and durational] requirement[s]" of Art. I, § 8, cl. 8 of the constitution. 455 U.S. at 473, 102 S.Ct. 1169.

and the useful Arts," is only as broad as the Copyright Clause allows.

Neither the Supreme Court's analysis in the *Trade–Mark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879) nor the Second Circuit's holding in *Authors League of America, Inc., et al. v. Oman, et al.,* 790 F.2d 220 (2d Cir.1986) support an opposite holding. In the *Trade–Mark Cases,* the Supreme Court struck down trademark legislation as outside the boundary of Congress' power under both the Copyright Clause and the Commerce Clause. The government relies on the Court's willingness to consider the applicability of the trademark statutes under the Commerce Clause, after determining that the Copyright Clause failed to provide the requisite power, as inferential support that the Copyright Clause does not limit Congress' power under alternative grants. However, this reliance is unfounded. In the *Trade–Mark Cases,* the Supreme Court did not address the limitations imposed by the Copyright Clause because the Supreme Court concluded that "the constitutional provision concerning authors and inventors, and their writings and discoveries [the Copyright Clause]" did not encompass the subject of trademarks. *Id.* Therefore, the Supreme Court's analysis does not suggest that Congress may enact legislation that falls *within* the purview but not the power of the Copyright Clause, under its Commerce Clause authority. Rather, the *Trade–Mark Cases* establish the non-controversial point that when Congress does not regulate in the field covered by the Copyright Clause, it may look to an alternative grant of power. Here, unlike in the *Trade–Mark Cases,* the anti-bootlegging statute falls squarely within the purview of the Copyright Clause, and therefore, Congress is limited by the restrictions that the Copyright Clause imposes on its power.[18]

Similarly, in *Authors League of America, Inc., et al. v. Oman, et al.,* 790 F.2d 220 (2d Cir.1986), the Second Circuit's resort to the Commerce Clause to support the manufacturing clause, a provision of the 1976 Copyright Act, does not establish that Congress may avoid the express limitations of the Copyright Clause through reference to an alternate Clause. The manufacturing clause provides, in relevant part:

> The importation into or public distribution in the United States of copies of a work consisting predominantly of [nondramatic] literary material that is in the English language and is protected under this title is prohibited unless the portions consisting of such material have been manufactured in the United States or Canada.

17 U.S.C. § 601(a) (1985). Hence, the clause "regulate[s] commercial distribution of literary works printed outside the country *for the purpose of fostering the growth of an American industry,*" *Authors League of America, Inc., et al.,* 790 F.2d at 224, not "to promote the Progress of Science and the useful Arts." While the Copy-

---

**18.** "[T]here are fundamental differences between copyright law and trademark law. Copyright law ... protects fruits of intellectual labor, such as literary or dramatic works, musical compositions, motion pictures, sound recordings, architectural works, and other similar original works of authorship. A trademark, by way of contrast, grows out of the adoption and use of a distinctive symbol by the party using it. Its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his ... The creation and expression of an original work is protected by copyright law, and once an original work has been produced trademark law is not the proper means of protecting the rights in this originality." *EMI Catalogue Pshp. v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 63–64 (2d Cir.2000) (internal citations and quotations omitted).

right Act itself is a product of Congress' Copyright Clause authority, and shares the Copyright Clause's purpose, the manufacturing clause was enacted with a different focus—the protection of the American printing industry. Therefore, the Second Circuit's finding that the "denial of copyright protection to certain foreign-manufactured works is clearly justified as an exercise of the legislature's power to regulate commerce with foreign nations," *Id.* (citing U.S. Const. art. 1, § 8, cl. 3), is not inconsistent with the conclusion that Congress may not avoid express limitations on its authority by acting under a separate grant. The Second Circuit's holding in *Authors League of America, Inc., et al.* does not address Congress' power to enact legislation under the Commerce Clause for the purpose outlined in the Copyright Clause when such legislation directly conflicts with the Copyright Clause's express limitations.[19]

This Court finds that the fixation and durational limitations inherent in the Copyright Clause restrict Congress' power to legislate in the quasi-copyright field, "to promote the Progress of Science and the useful Arts," U.S. Const. art. I, § 8, cl. 8,

under a separate enumerated power. Thus, the anti-bootlegging statute, because, by any fair reading, it directly violates both the Copyright Clause's fixation and durational[20] restrictions, and is a statute that falls within the purview of the Copyright Clause, is unconstitutional. Because there is no fair reading of the anti-bootlegging statute that would render it valid under the Copyright Clause, I find the statute to be unconstitutional. *See, e.g., Public Citizen,* 491 U.S. at 465–66, 109 S.Ct. 2558.

2. *Fundamentally Inconsistent With Copyright Clause Limitations*

 Alternatively, even if Congress may enact copyright-like legislation under grants other than the Copyright Clause, when it lacks the power under the Copyright Clause, such legislation may not be "fundamentally inconsistent" with the fixation and durational limitations imposed by the Copyright Clause. As assumed by the Court in *Moghadam,* 175 F.3d at 1280, "the Commerce Clause could not be used to avoid a limitation in the Copyright Clause if the particular use of the Com-

---

19. Finally, the government's resort to *Heart of Atlanta Motel, Inc. v. United States, et al.,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258, as support for the proposition that Congress may enact legislation under its Commerce Clause authority that it lacks the power to enact under a separate grant, is unconvincing. In *Heart of Atlanta Motel, Inc.,* the Supreme Court upheld the public accommodations provisions of the Civil Rights Act of 1964 as a proper exercise of Congress' power under the Commerce Clause, notwithstanding that the Fourteenth Amendment could not support the Act and "the particular obstruction to interstate commerce with which [the Act] was dealing was also deemed a moral and social wrong." *Id.* at 268–69, 85 S.Ct. 348. The Fourteenth Amendment, unlike the Copyright Clause, is solely an affirmative grant of power—without any express limitations. Therefore, when enacting legislation to prohibit dis-

crimination, Congress need not look solely to the Fourteenth Amendment, but may utilize other grants of power to achieve such an end.

20. *See* Pollack, 18 Seattle Univ. L.R. at 288–289 ("While courts have alluded to possible reinforcement of the Intellectual Property Clause with the Commerce Clause, no court has suggested that Congress may by pass [sic] the 'limited times' provision. Similarly, although Congress has passed intellectual property statutes by relying on the Commerce Clause, none of these statutes attempts to by pass [sic] the 'limited times' provision. Additionally, commentators have discussed the intersection of the Commerce Clause with the Intellectual Property Clause, but none has suggested a theory that allows Congress to bypass the 'limited times' provision.").

merce Clause (e.g., the anti-bootlegging statute) were fundamentally inconsistent with the particular limitation in the Copyright Clause (e.g., the fixation requirement)."[21] The anti-bootlegging statute's failure to impose a durational limitation on its regulation is "fundamentally inconsistent" with the Copyright Clause's requirement that copyright-like regulations only persist for "Limited Times." As explained *supra*, Part II.C.2, copyright-like protection must have boundaries in order to counter-balance the grant of monopoly power to the artist. The "Limited Times" requirement offsets this monopoly and ensures that the public will benefit, albeit at a later date, when the work reaches the public domain. *P.C. Films Corp. v. Turner Entm't Co.*, 954 F.Supp. 711, 715

(S.D.N.Y.1997) (citations omitted). The need to retain this equilibrium is no less when a federal grant of monopoly power originates from an exercise of Congress' authority under an alternate grant. Thus, the anti-bootlegging statute's failure to include a durational limitation renders it "fundamentally inconsistent" with the tenor of Congress' authority pursuant to the Copyright Clause.

## III. CONCLUSION

For the foregoing reasons, because this Court finds that the anti-bootlegging statute, 18 U.S.C. § 2319A, is unconstitutional under the Copyright Clause,[22] defendant's motion to dismiss the Indictment is granted. The Clerk is instructed to close this

**21.** While the defendant in *Moghadam* did not challenge the anti-bootlegging statute's lack of a durational component, the *Moghadam* Court went to great lengths to underscore that its holding was limited to a challenge on the "Writing" limitation alone, and to suggest that had *Moghadam* challenged the perpetual nature of the regulation, its holding may have differed. *Moghadam*, 175 F.3d at 1274 ("We note that the anti-bootlegging statute may be faced with another constitutional problem under the Copyright Clause. The Clause allows Congress to extend protection to authors only for 'Limited Times.' The protection afforded to live performances by § 2319A, however, contains no express time limitation and would arguably persist indefinitely. However, Moghadam has not preserved this argument, *see infra*, and we decline to address the argument in light of our disposition of this case."); at 1281 n. 14 ("Our holding is limited to the fixation requirement, and should not be taken as authority that the other various limitations in the Copyright Clause can be avoided by reference to the Commerce Clause"); at 1281 ("We note that there is another limitation in the Copyright Clause that may be implicated by the anti-bootlegging statute: the 'Limited Times' requirement that forbids Congress from conferring intellectual property rights of perpetual duration. On its face, the protection created by the anti-bootlegging statute is apparently perpetual and contains no express

time limit; therefore phonorecords of live musical performances would presumably never fall into the public domain. However, because Moghadam has not challenged the constitutionality of § 2319A on this basis, we decline to raise the issue *sua sponte*. Thus, we *do not decide in this case whether* extending copyright-like protection under the anti-bootlegging statute might be fundamentally inconsistent with the 'Limited Times' requirement of the Copyright Clause, and we do not decide in this case whether the Commerce Clause can provide the source of Congressional power to sustain the application of the anti-bootlegging statute in some other case in which such an argument is preserved. We reserve those issues for another day.") (internal citations omitted); at 1282 ("As noted above, Moghadam has waived any constitutional challenge based on the 'Limited Times' requirement of the Copyright Clause, and thus our holding in this case is further narrowed by the fact that we do not address potential arguments based on the 'Limited Times' requirement.")

**22.** Since this Court determines that the Copyright Clause prohibits Congress from enacting the anti-bootlegging statute, the Court need *not decide whether the statute violates the* First Amendment's protections of free speech or the Tenth Amendment's protection of the states' reserved powers.

motion and this case and remove it from my docket.

**IT IS SO ORDERED.**