United States v. Martignon

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2004

(Argued:  July 12, 2005                                    Decided: June 13, 2007)

Docket No. 04-5649-cr

_____

UNITED STATES OF AMERICA,

Appellant,

-v-

JEAN MARTIGNON,

Defendant-Appellee.

_____

Before:  POOLER and SACK, Circuit Judges, and GARAUFIS, District Judge.*

_____

The government appeals an order of the United States District Court for the Southern

District of New York (Harold G. Baer, Judge) dismissing an indictment against defendant Jean

Martignon.  The indictment charged violation of the distribution and reproduction provisions of

_____

* The Honorable Nicholas G. Garaufis, United States District Judge for the Eastern
District of New York, sitting by designation.

the criminal anti-bootlegging statute, 18 U.S.C. § 2319A(a)(1),(3). The district court held that Congress lacked power to promulgate this statute under either the Copyright or Commerce Clauses of the United States Constitution. See U.S. Const. art. I, § 8, cls. 3, 8.

Vacated and remanded.

———————

SAMIDH GUHA, Assistant United States Attorney for the Southern District of New York (David N. Kelley, United States Attorney for the Southern District of New York, Peter G. Neiman, Assistant United States Attorney, on the brief), New York, NY, for Appellant.

DAVID E. PATTON, The Legal Aid Society Federal Defender Division Appeals Bureau (Yuanchung Lee on the brief), New York, NY.

Paul Bender, Michael R. Klipper, Christopher A. Mohr, Meyer, Klipper & Mohr, PLLC, Washington, DC, for Amici Curiae  Association of American Publishers, American Business Media, CoStar Group, Inc; National Association of Realtors®, Reed Elsevier, Inc., and the Software & Information Industry Association, in support of Appellant.

Jennifer M. Urban, Director, Intellectual Property Clinic, University of Southern California, Gould School of Law (Lydia Wahlke and Anne DePree, Clinical Interns, on the brief), Los Angeles, CA, for Amici Curiae Internet Archive, American Association of Law Libraries, Association of Research Libraries and Special Libraries Association in support of Defendant-Appellee.

Deirdre K. Mulligan, Director, Samuelson Law, Technology & Public Policy Clinic, University of California School of Law (Boalt Hall) (Jack I. Lerner, Clinic Fellow, on the brief), Berkeley, CA, for Amici Curiae Twenty-Nine Intellectual Property and Constitutional Law Professors in support of Defendant-Appellee.

Robert W. Clarida, Cowan, Liebowitz & Latman, P.C., for Amici Curiae UMG Recordings, Inc., EMI Music North America d/b/a Capitol Records, Inc., Warner Music Inc., Univision Music LLC, d/b/a Univision Music Group, National Academy of Recording Arts & Sciences, American Federation of Musicians of the United States and Canada, American Federation of Television and Radio Artists, Recording Artists Coalition and National Music Publishers Association, Inc. in support of Appellant.

———————

POOLER, Circuit Judge:

This appeal presents a recurring issue in constitutional law: the extent to which Congress can use one of its powers to enact a statute that it could not enact under another of its arguably relevant powers. See, e.g., Ry. Labor Executives' Ass'n v. Gibbons, 455 U.S. 457 (1982); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964); In re Trade-Mark Cases, 100 U.S. 82 (1879). Here the statute involved is Section 2319A of Title 18, which prohibits the unauthorized recording of performances as well as the copying, distribution, sale, rental, and trafficking of these bootlegged phonorecords. The constitutional grants of congressional power at issue are the Commerce Clause, Art. I § 8, cl. 3, which permits Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," and the Copyright Clause, Art. I, § 8, cl. 8, which empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

The district court held that Section 2319A was not validly enacted under the Copyright Clause because it gives rights to performers that are unlimited in time without requiring that the performer have reduced his or her performance to a fixed form. See United States v. Martignon, 346 F. Supp. 2d 413, 424 (S.D.N.Y. 2004). The court also held that Congress could "not enact [such] copyright-like legislation . . . under the [C]ommerce [C]lause (or any other clause), when the legislation conflicts with the limitation[s] imposed by the Copyright Clause." Id. at 425 (internal footnote omitted).

After examining the statute, its background, the two relevant constitutional clauses, and applicable precedent, we conclude that Congress was free to act under the Commerce Clause to

3

enact Section 2319A(a)(1) and (3).  Our conclusion is limited to those provisions alone and does not reach other anti-bootlegging provisions of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994),  from which Section 2319A is drawn.

## BACKGROUND

*The Statute*

The URAA was passed after the Uruguay Round of negotiations respecting the General Agreement on Tariffs and Trade ("GATT").  William F. Patry, Copyright and the GATT An Interpretation and Legislative History of the Uruguay Round Agreements Act  1 (1995).  The Uruguay Round produced, in addition to other agreements, the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS").  Id. at 2-3. TRIPS art. 14(1) provides:  "In respect of a fixation of their performance on a phonogram, performers shall have the possibility of preventing the following acts when undertaken without their authorization:  the fixation of their unfixed performances and the reproduction of such fixation."  These rights must persist for at least fifty years from the end of the calendar year in which the fixing or performance took place.  TRIPS art. 14(5).  The state parties to TRIPS are "free to determine the appropriate method of implementing the provisions of [TRIPS] within their own legal system and practice." TRIPS art. 1(1).

On December 15, 1993, President Clinton notified the House and Senate of his intent to enter into the Uruguay Round Trade Agreements including TRIPS.  Memorandum from President William Jefferson Clinton to the Honorable Al Gore, President of the Senate, dated December 15, 1993 (reprinted in Patry, supra, App. B at B-3-B-6).  After the Uruguay Round Trade Agreements had been executed, Congress enacted the URAA.  Pub. L. No. 103-465, 108

4

Stat 4809 (1994). The URAA contains two sections aimed at preventing bootlegging of records. Section 512, codified at 17 U.S.C. § 1101, provides a civil cause of action for a performer whose performance was recorded without her consent, while Section 513, codified at 18 U.S.C. § 2319A, provides criminal remedies to the government.

Section 2319A(a) provides that a person who, without the consent of the performer or performers, "knowingly" and for "commercial advantage or private financial gain"

> (1) fixes the sounds or sounds and images of a live musical performance in a copy or phonorecord, or reproduces copies or phonorecords of such a performance from an unauthorized fixation;
> (2) transmits or otherwise communicates to the public the sounds or sounds and images of a live musical performance; or
> (3) distributes or offers to distribute, sells or offers to sell, rents or offers to rent, or traffics in any copy or phonorecord fixed as described in paragraph (1)

may be imprisoned for up to five years and for up to ten years for a second offense.[1]

"'Phonorecords' are material objects in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101; see also 18 U.S.C. § 2319A(e)(1) (adopting Title 17 definitions of various terms including "phonorecords").

*District Court Proceedings*

On October 27, 2004, a grand jury charged Martignon, the proprietor of Midnight Records in Manhattan, with one count of violating Section 2319A by reproducing an unauthorized phonorecord and by distributing and selling and offering to distribute and sell

---

[1] 17 U.S.C. § 1101(a) provides that copyright remedies shall be available against persons who commit the same acts. Unlike Section 2319A, Section 1101 does not require any particular mens rea or that the act be performed for commercial gain or private financial gain.

phonorecords of performances which had been recorded or fixed without the consent of the performer or performers. Martignon moved to dismiss the indictment, arguing that Section 2319A violated the Copyright Clause because live performances are not "Writings" within the meaning of the clause and because live performances were given protection for perpetuity rather than for a "limited Time[]". Martignon also claimed that the statute violated the First Amendment. The government responded that Congress had authority to enact Section 2319A under the Commerce and Necessary and Proper Clauses.[2]

The district court granted the motion to dismiss. Martignon, 346 F. Supp. 2d at 429. The court began its analysis with an examination of whether Section 2319A was copyright or commercial regulation. Id. at 419. Although the court acknowledged that if Congress had the power to enact Section 2319A under the Commerce Clause, its belief that it was acting under the Copyright Clause would not be dispositive, id. at 419-20, it held that "it is still essential to determine how to classify a statute in order to ensure that it does not run afoul of any express limitations imposed on Congress when regulating in the respective arena," id. at 420. For four separate but related reasons, Judge Baer concluded that Section 2319A was more closely tied to the Copyright than to the Commerce Clause. First, the agreement that it implemented, TRIPS, was intended to protect intellectual property. Id. Second, the words of the statute were consistent with the purpose of the Copyright Clause, encouraging authors and inventors to create by granting them exclusive rights in their writings and discoveries. Id. Third, the Committee on

_____

[2]The Necessary and Proper Clause, which does not figure in our disposition of this case, allows Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const., art. I, § 8, cl. 18.

6

the Judiciary's report describes the legislation in terms of copyright and contains no mention of commerce. Id. at 421 (citing S. Rep. No. 103-412, at 224 (1994)). Fourth, Section 2319A follows the criminal copyright provision and refers to the definitions in Title 17, the copyright title of the United States Code. Id. at 421-22.

Despite the copyright-like appearance of Section 2319A, the district court held that it could not be sustained under the Copyright Clause because it "provides seemingly perpetual protection for unfixed musical performances." Id. at 423. Because the performances are unfixed at the time they are recorded, the court held that they were not "Writings" within the coverage of the Copyright Clause. Id. at 423-24. Because the protection accorded a live performance is perpetual, the court reasoned that Section 2319A violates the "limited Times" provision of the Copyright Clause. Id. at 424.

Finally, the court held that Congress could not do indirectly, under the Commerce Clause or the Necessary and Proper Clause, what it is forbidden to do directly under the Copyright Clause. Id. at 424-25 & n.15. More specifically, the court held: "Congress may not, if the Copyright Clause does not allow for such legislation, enact the law under a separate grant of power, even when that separate grant provides proper authority. Id. at 425. Because Section 2319A was, in Judge Baer's view, "copyright-like legislation," it could not be enacted under any other clause of the Constitution if it violated the limitations of the Copyright Clause. Id. The district court therefore found Section 2319A unconstitutional. Id. at 428. As an alternative to finding an absolute ban against enacting copyright-like legislation under any clause other than the Copyright Clause, Judge Baer held that "even if Congress may enact copyright-like legislation under grants other than the Copyright Clause, . . . such legislation may not be 'fundamentally

7

inconsistent' with the fixation and durational limitations imposed by the Copyright Clause." Id. He then found fundamental inconsistency between the "limited Times" provision and Section 2319A's failure to impose a time limit for violations.[3]

On October 22, 2004, the government filed a timely notice of appeal.

*The Government's Contentions on Appeal*

The government argues that the district court's order is erroneous for two principal reasons. First, they claim that the Copyright Clause is solely an affirmative grant of power and does not limit Congress's power to act under other clauses of the Constitution. Second, even assuming that the Copyright Clause has some limitations, the government contends that these limitations can only apply to matters within its scope, that is, fixed creative works or "Writings." **[Blue at 7]**

## DISCUSSION

Because the government concedes Congress could not have enacted Section 2319A pursuant to the Copyright Clause, we must determine whether the Copyright Clause's limitations also limit Congress's power to regulate creative works under the Commerce Clause. On its face, Article I, § 8, simply grants powers to Congress. No Section 8 clause, including the Copyright Clause, states that Congress can make certain laws only pursuant to that particular clause or that any limitations on the power granted by that clause carry over to Congress's power to act in a related area under a different Section 8 clause. Nevertheless, in limited instances, the expressed

---

[3] The only other court to assess the constitutionality of Section 2319A concluded that it was properly enacted pursuant to the Commerce Clause. See United States v. Moghadam, 175 F.3d 1269 (11th Cir. 1999). Moghadam, unlike Martignon, did not argue that Section 2319A violated the "limited Times" provision of the Copyright Clause, and the Eleventh Circuit carefully noted that it did not reach this issue. See id. at 1273, 1281 & n. 15.

8

limitations of one clause do apply externally to another clause.  See Gibbons, 455 U.S. at 468.

To determine whether Section 2319A is invalid because it violates limitations of the Copyright

Clause, we must analyze the extent to which the Copyright Clause can be read to limit

Congress's power to enact legislation under the Commerce Clause.  Because a central focus of

the parties' argument on external limitations is whether "Writings" in the Copyright Clause is

part of that clause's grant of power or its limitations, we first consider whether the grant of power

in the Copyright Clause can be separated with any clarity from constitutionally created

limitations on that power.  We conclude that another word in the Copyright Clause – "securing" –

may more easily be read to be at least a part of the Clause's grant of power, rather than a

limitation; we thus need not determine on which side of the line "Writings" falls.  Primarily

focusing on a trio of cases—the Trademark Cases, Heart of Atlanta, and Gibbons—in which the

Supreme Court has considered issues similar to the one that confronts us, we conclude that the

Commerce Clause suffices as authority for Section 2319A.

*Scope and Limits of the Copyright Clause*

In Graham v. John Deere Co., the Court described the Copyright Clause as "both a grant

of power and a limitation."  383 U.S. 1, 5 (1966).  Seizing on this phrase, Martignon argues that

the grant of power is the authority to regulate creative works and that the limitations are the

requirements of fixation and time-limitation.  Martignon also argues—although Graham did not

so hold—that the limitations apply externally to the Copyright Clause to limit Congress's power

to enact copyright-like legislation under other portions of Article I, § 8.

The Copyright Clause provides that Congress has the power "[t]o promote the Progress of

Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive

9

Right to their respective Writings and Discoveries." U.S. Const. art. 1, § 8, cl. 8. The government argues that this clause means that the government has the power to regulate creative and fixed works by granting their creators exclusive rights for a limited time. Martignon, on the other hand, contends that the clause gives the government the power to regulate creative works by granting authors and inventors exclusive rights in <u>written works</u> for a limited time. Under the government's interpretation of the clause, performances are completely outside the scope of the Copyright Clause because they are not fixed. Under Martignon's interpretation, performances are within the scope of the Copyright Clause because they are creative works but violate its limits because the performances are not fixed and the protection is granted for an unlimited time. In an alternative argument, Martignon claims that the subsections underlying the charge against him violate the "limited Times" provision—regardless of whether the fixation requirement is considered as part of the grant of power or as a limitation—because he could only have sold, copied or distributed fixed works. Martingnon further argues that once we determine original works are within the scope of the Copyright Clause, we must necessarily conclude that Congress cannot regulate original works under any other grant of power.

It is not clear from the wording of the Copyright Clause where the grant of power ends and where the limitation(s) begin(s). This clause allows Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." One could draw the line between grant and limitation(s) almost anywhere in this sentence. For example, the grant of power could be to pass legislation to promote the useful arts and sciences, limited, however, to the realm of the original, to the method of granting exclusive rights, and to a period of limited duration. Conversely, the

10

Clause can be construed to allow Congress to pass legislation giving creators of original work an exclusive right in their fixed work, limited only by the requirement that the grant be of limited duration. We find no useful punctuation or structural clues in the text of the clause. Indeed, the "limited Times" language, which both parties agree is a limitation rather than part of a grant of power, is squarely in the middle of the Clause. Further, the Graham Court read the creativity requirement, "[t]o promote the . . . useful Arts," as a limitation on Congress's power, thus suggesting that the power granted and the limitations are virtually coterminous. See 383 U.S. at 5. The text of the Copyright Clause does not alone provide sufficient guidance for us to decide where to draw that line for purposes of deciding this case.

The Supreme Court has indicated that Congress can sometimes enact legislation under one constitutional provision that it could not have enacted under another. See, e.g., Heart of Atlanta, 379 U.S. at 260-61 (upholding a civil rights statute as a permissible exercise of Commerce Clause power, although a similar statute previously had been declared unconstitutional as beyond the power of Congress under the Thirteenth and Fourteenth Amendments, see The Civil Rights Cases, 109 U.S. 3, 10-25 (1883)). However, this power is not unlimited. See Gibbons, 455 U.S. at 465-66 (holding that a statute was repugnant to the Bankruptcy Clause and could not be considered a legitimate exercise of Commerce Clause power even though bankruptcy and commerce are "intimately connected"). Because the parties attach different import to these cases and to the Trade-Mark Cases, we examine them to determine where to draw the line between (1) a law which, while related to one constitutional provision and unauthorized by it, can be validly enacted under a different provision; and (2) legislative action that is prohibited under one provision and cannot be enacted under another even though it is

11

seemingly within the purview of the second provision. We find no absolute answers because none of the cases cited by the parties is directly on point. However, we do find strong indicators of the lines along which our analysis must proceed.

We begin with the Trade-Mark Cases in which the Court held that a criminal trademark statute was not authorized by the Copyright Clause because trademarks do not require originality. 100 U.S. at 94. The Court then held that because the trademark statute was not limited to interstate commerce, it could not be justified as an exercise of Commerce Clause power.[4] Id. at 97-98. We read this case as standing for the proposition that when an intellectual property law could not have been enacted pursuant to the Copyright Clause because it governs works lacking originality, a court should alternatively consider whether it was validly enacted under the Commerce Clause.

Heart of Atlanta considered a law prohibiting discrimination on account of race in privately owned public accommodations such as motels and hotels. 379 U.S. at 247. The legislation that the Heart of Atlanta Court considered was not the first attempt by Congress to prohibit racial discrimination in public accommodations. Some eighty years previously, after considering any authority the Fourteenth Amendment[5] gave Congress to enact legislation prohibiting private discrimination, the Court had held that a very similar statute was

---

[4] This decision reflects the Court's earlier limited view of the Commerce Clause. Trademark legislation, has long since been upheld as an exercise of Commerce Clause power even where a defendant uses its mark only in intrastate commerce. Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 365 (2d Cir. 1959).

[5] The Court also examined and rejected Congress's authority pursuant to the Thirteenth Amendment, but its analysis is not relevant to the issues before us. The Civil Rights Cases, 109 U.S. at 20-25.

12

unconstitutional. The Civil Rights Cases, 109 U.S. at 18-19.

The Fourteenth Amendment provides in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Court, therefore, held that some form of state action was necessary to trigger Congress's power under the Fourteenth Amendment. The Civil Rights Cases, 109 U.S. at 11. Because the statute under consideration applied to private actors, the Court invalidated it. Id. at 18-19. In passing, the Court said, "whether congress, in the exercise of its power to regulate commerce among the several states, might or might not pass a law regulating rights in public conveyances passing from one state to another, is also a question which is not now before us, as the sections in question are not conceived in any such view." Id. at 19.

In contrast, before enacting the civil rights bill at issue in Heart of Atlanta, Congress heard testimony that "discrimination by race or color places [burdens] upon interstate commerce." Heart of Atlanta, 379 U.S. at 252. Further, Congress limited the applicability of the Act to those motels, inns, and hotels that offered more than five rooms to transient guests and therefore affected interstate commerce. Id. at 247-48. The Court held that the Civil Rights Cases were "inapposite" because the statute in question was confined to institutions affecting interstate commerce. Id. at 250. Despite its conclusion "[t]hat Congress was legislating against moral wrongs," the Court upheld the law based on "the overwhelming evidence of the disruptive effect that racial discrimination has had on commercial intercourse." Id. at 257.

Heart of Atlanta takes us a step further than the Trade-Mark Cases. From the latter case,

13

we draw the not surprising conclusion that if a statute is outside even the most generalized interpretation of the scope of the Copyright Clause, i.e., it is not a copyright law, it can be regulated under the Commerce Clause.  However, it cannot be said that racial discrimination is outside the scope of the Fourteenth Amendment; instead, it is at its core.  Therefore, at least in some instances, Congress can regulate under the Commerce Clause what it could not regulate under an amendment specifically aimed at the wrong at issue.

Martignon, however, contends that Heart of Atlanta is very different from this case because the Fourteenth Amendment contains no specific limitations on Congress's general power to enact legislation.  The Fourteenth Amendment, of course, is limited to state action, but that restriction is expressed as a part of the grant of power given to Congress rather than as a limitation on the power once granted.  Thus, in Martignon's view, Heart of Atlanta closely resembles the Trade-Mark cases.  Just as the Copyright Clause empowers Congress to regulate creative works, the Fourteenth Amendment grants Congress the power to act against state-sponsored discrimination.  It then would follow that just as Congress was free to regulate non-creative trademarks under the Commerce Clause, it was also free to prohibit discrimination that was not state-sponsored under the same clause.  While Martignon's argument may have some logic to support it, the Heart of Atlanta Court drew no such subtle distinctions between the grant of power and limitations on the grant of power.  Rather, the Court simply reasoned that it didn't matter if Congress lacked the power to enact anti-discrimination legislation covering private actors under the Fourteenth Amendment as long as it possessed sufficient power under the Commerce Clause.

We turn finally to Gibbons, which is at the heart of Martignon's claim that Congress

14

could not enact Section 2319A under the Commerce Clause because of limitations contained in

the Copyright Clause. In 1975, The Chicago, Rock Island, and Pacific Railroad Co. ("Rock

Island") petitioned for reorganization under the bankruptcy laws. Gibbons, 455 U.S. at 459. In

1979, a strike caused Rock Island to stop operations, and the bankruptcy court directed Rock

Island's trustee to prepare a liquidation plan. Id. In June 1980, the bankruptcy court concluded

that employee-labor-protection claims could not be paid out of Rock Island's assets. Id. at 460.

Congress responded by enacting the Rock Island Railroad Transition and Employee Assistance

Act ("RITA"). Id. at 461. RITA provided that the trustee must pay up to $75 million to Rock

Island employees who were not hired by other carriers. Id. at 461-62. These payments were to

be made as administrative expenses, which would give them priority over other creditors' claims.

Id. at 463.

When the matter reached the Supreme Court, it invalidated the pertinent RITA provisions

as "repugnant to Art. I, § 8, cl. 4, the Bankruptcy Clause, of the Constitution." Id. at 465. First,

the Court analyzed whether RITA was an exercise of Congress's Bankruptcy Clause or

Commerce Clause power. It acknowledged that "[d]istinguishing a congressional exercise of

power under the Commerce Clause from an exercise under the Bankruptcy Clause is . . . not an

easy task, for the two Clauses are closely related." Id. Nevertheless, and for several reasons, the

Court found that Congress exercised its power under the Bankruptcy Clause. Id. at 466. First,

RITA contained specific directives to the bankruptcy court concerning the distribution of the

property of a particular estate. Id. at 467. Second, it rearranged the priorities of various

payments from the estate, giving the employees priority over other creditors. Id. Third, the

events surrounding the enactment of the legislation indicated that Congress knew it was

15

exercising its powers under the Bankruptcy Clause. Id. at 467-68. Finally, RITA was passed almost five years after Rock Island sought the protection of the bankruptcy laws. Id. at 468.

The Court then turned its attention briefly to the Commerce Clause, saying, "[w]e do not understand either appellant or the United States to argue that Congress may enact bankruptcy laws pursuant to its power under the Commerce Clause." Id. at 468. The Court also noted that the Bankruptcy Clause "contain[ed] an affirmative limitation or restriction upon Congress' power"—that bankruptcy laws must be uniform throughout the United States—that was not contained in the Commerce Clause. Id. The Court therefore reasoned that "if we were to hold that Congress had the power to enact nonuniform bankruptcy laws pursuant to the Commerce Clause, we would eradicate from the Constitution a limitation on the power of Congress to enact bankruptcy laws." Id. at 468-69. The Court then examined the uniformity requirement, found that RITA violated this requirement, and declared it unconstitutional. Id. at 469-73.

Gibbons' analysis differs in one important respect from the cases we have previously examined: It considers whether RITA was really a bankruptcy or a commercial regulation. Read too broadly, this aspect of Gibbons would conflict with clear Supreme Court precedent holding that it does not matter that Congress believes it is legislating under a clause which would not give it the power it seeks as long as it actually has the power to legislate under another. See Woods v. Cloyd W. Miller, 333 U.S. 138, 144 (1948). A careful reading of Gibbons avoids any such conflict. The Gibbons Court considered primarily what RITA did, not Congress's belief as to which clause authorized its action. RITA mandated that an existing bankruptcy proceeding be handled differently from any other bankruptcy in the United States. It also altered the statutory priorities for paying debts and the administrative scheme contemplated by the Bankruptcy Code.

16

It was a bankruptcy law.

We believe that the Supreme Court's cases allow the regulation of matters that could not be regulated under the Copyright Clause in a manner arguably inconsistent with that clause unless the statute at issue is a copyright law. We draw this lesson from Heart of Atlanta and from Gibbons. In Heart of Atlanta, the Court found authority for Congress to enact a statute that prohibited race discrimination in public accommodations affecting interstate commerce, even though the prohibition ran to discrimination not involving "state action," under the Commerce Clause although the Fourteenth Amendment did not allow Congress to enact a similar statute. The Gibbons Court found that RITA was actually a bankruptcy law, not that it was very close to a bankruptcy law or that it was bankruptcy-like. Because Gibbons is the only case called to our attention by the parties or the amici in which the Supreme Court struck down a statute that violated the limitation of one constitutional provision despite its clear nexus to another provision, we conclude that Congress exceeds its power under the Commerce Clause by transgressing limitations of the Copyright Clause only when (1) the law it enacts is an exercise of the power granted Congress by the Copyright Clause and (2) the resulting law violates one or more specific limits of the Copyright Clause. For reasons that follow, though, to resolve this appeal, we need not identify the full scope of the power granted by the Copyright Clause.

With these principles in mind we consider whether Section 2319A is a copyright law in the sense that RITA was a bankruptcy law. See Gibbons, 455 U.S. at 467-68 (discussing the factors that identified RITA as a bankruptcy law). The Gibbons Court described aspects of RITA—rearranging priorities for claims against the debtor and directing the bankruptcy court to distribute the estate in a certain manner—that mirrored, albeit in a way that violated the

17

Bankruptcy Clause, provisions of bankruptcy law. We will judge the constitutionality of Section 2319A under the same standard that the Gibbons Court used; that is, in order to demonstrate unconstitutionality, Martignon must establish that Section 2319A is a copyright law and not just that it is copyright-like.

We perceive two possible avenues to a resolution of the issues before us. As a starting point for deciding whether Martignon has met his burden, we examine first the text of the Copyright Clause, in light of the cases we have discussed. Unlike the Bankruptcy Clause analyzed in Gibbons, the Copyright Clause does not identify the type of law Congress may pass pursuant to it – indeed, the word "copyright" does not appear in it at all. To repeat, the clause reads: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The clause thus empowers Congress to "secur[e] . . . Right[s]." We understand the word "secure" to mean to create, bestow, and allocate, rather than to add protection for separately created and existing rights. See Wheaton v. Peters, 33 U.S. 591, 660-61 (1834) (concluding that "secur[e]," in this context, does not mean protect; it means establish). Using this textual approach, the issue becomes whether Section 2319A creates, bestows, or allocates rights.[6]

_____

[6] We are not here presented with an occasion to analyze the constitutionality of the Lanham Act, 15 U.S.C. § 1125, which might be thought to allocate property rights in (unoriginal) expression. But we do not mean to cast doubt on our conclusion in Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 365 (2d Cir. 1959), that the Commerce Clause furnishes authority for Congress to establish trademark rights. Instead, we state only that in order for a law to be considered an exercise of Congress's Copyright Clause power, it must allocate property rights in expression. Because Section 2319A does not meet that minimal requirement, we need not here delve into what other characteristics are necessary. Suffice it to say for the moment that

(continued...)

18

The second way to identify the controlling characteristic of the power granted Congress by Article I, Section 8, cl. 8 is to rely on its history and context. Although the clause does not mention the word "copyright," the framers did. See The Federalist, No. 43 (quoting the clause and arguing for its utility by referencing the "copyright of authors" in England). If the clause is meant to give Congress the power to pass copyright laws, we can fashion a working definition of a "copyright law" by looking for characteristics common to statutes, not governed by the grant of power embodied in the Copyright Clause, that are concededly copyright laws. Copyright laws adopted by the colonies prior to ratification, colonial-era British copyright laws, and state copyright laws are helpful. They all seem to share a common feature: They allocate property rights in expression. See, e.g., Statute of Anne, 1710, 8 Anne, ch. 19 (Eng.); Law of March 17, 1783, An Act for the Purpose of Securing to Authors the Exclusive Right and Benefit of Publishing their Literary Productions, for Twenty-One Years, Massachusetts. Modern state copyright laws sometimes allocate rights for unlimited times, or they grant rights to unfixed works, see, e.g., Cal. Civ. Code § 980(a)(1) – evidence that duration and fixation requirements are not identifying characteristics of copyright laws. In any event, though allocation of property rights is not a sufficient condition for calling something a copyright law, cf. Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.3d 358, 365 (2d Cir. 1959) (holding that the Lanham Act is a valid exercise of congressional power under the Commerce Clause), it is a necessary one.

Section 2319A does not create and bestow property rights upon authors or inventors, or allocate those rights among claimants to them. It is a criminal statute, falling in its codification

[6](...continued)
we think the Lanham Act does not have additional characteristics that would make it an exercise of Copyright Clause power.

19

(along with Section 2319B about bootlegged films) between the law criminalizing certain copyright infringement and the law criminalizing "trafficking in counterfeit goods or services." It is, perhaps, analogous to the law of criminal trespass. Rather than creating a right in the performer him- or herself, it creates a power in the government to protect the interest of performers from commercial predations. Section 2319A does not grant the performer the right to exclude others from the performance – only the government can do that. Cf. College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 673 (1999) (stating that "[t]he hallmark of a protected property interest is the right to exclude others" and that this right is "one of the most essential sticks in the bundle of rights that are commonly characterized as property" (internal quotation marks omitted)). Neither may the performer transfer his or her interests under Section 2319A to another. Compare 18 U.S.C. § 2319A (providing that only the performer may grant or deny authorization) with 17 U.S.C. § 201(d) (providing for the transfer of "ownership of a copyright"). Section 2319A only prevents others from doing something without the authorization of the protected person. It may therefore protect the property interests an individual holds by virtue of other laws, but it does not itself allocate those interests. Section 2319A is not a law "secur[ing] . . . rights," nor is it a copyright law.

Thus, under either mode of analysis, Section 2319A is not subject to the limitations of Article I, Section 8, cl. 8. A comparison of Section 2319A to the current Copyright Act reinforces this conclusion. The Copyright Act grants the holder of a copyright the exclusive right

> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease or lending;
> (4) in the case of literary, musical, dramatic, and choreographic works,

20

pantomimes and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

 (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly;  and

 (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106.

Section 2319A might be read to give the artist at least one right—the right to allow the fixation of his or her performance—but the Copyright Act gives the author an extensive bundle of rights in his fixed work.  Unlike a performer under Section 2319A, an author enjoying Copyright Act protection may prevent others from performing, copying, or preparing derivative works from the author's copyrighted work.  Further, the Copyright Act, but not Section 2319A, gives the author of a work the right to transfer his rights in the work to another person or entity.  See 17 U.S.C. § 106.  Because "the princip[al] purpose of the [Copyright Act] is to encourage the origination of creative works by attaching enforceable property rights to them," the contrast between the very limited right given to a performer by Section 2319A and the extensive rights given by Section 106 is significant.  Matthew Bender & Co., Inc. v. West Publ'g Co., 240 F.3d 116, 122 (2d Cir. 2001) (internal quotation marks omitted); see Roth v. Pritikin, 710 F.2d 934, 939 (2d Cir. 1983) (avoiding an interpretation of the Copyright Act that would raise a constitutional question arising from the fact that "[a]n interest in a copyright is a property right protected by the due process and just compensation clauses of the Constitution").

In sum, Section 2319A does not create, bestow, or allocate property rights in expression, it does not share the defining characteristics of other laws that are concededly "copyright laws,"

21

and it differs significantly from the Copyright Act that was passed pursuant to the Copyright Clause (and that is valid under it). We therefore conclude that it was not enacted under the Copyright Clause. We have no need to examine whether it violates limits of the Copyright Clause and proceed instead to an examination of its sustainability under the Commerce Clause.[7]

*Commerce Clause Authority*

"It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality." Usery v. Turner Elkhorn Mining Co. , 428 U.S. 1, 15 (1976). "A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends." Fed. Energy Regulatory Comm'n v. Mississippi, 456 U.S. 742, 754 (1982). Section 2319A has substantial commercial and economic aspects. Indeed, regulation of bootlegging is necessary at the federal level because of its interstate and international commercial aspects. Without this scope, bootlegging could be adequately regulated, as it has been in the past, by the states. See Moghadam, 175 F.3d at 1272 n.5. Given the nexus between bootlegging and commerce, it is clear that absent any limitations stemming from the Copyright Clause, Congress would have had the power to enact Section 2319A(a)(1) & (3) under the Commerce Clause. Further, Section 2319A regulates only fixing,

---

[7] We acknowledge that our analysis necessarily triggers concerns about the ability of Congress to criminalize other conduct that would be permitted under the Copyright Clause and the copyright laws of this country, for instance the reproduction and sale of a literary work that has long lost its copyright protection. Because such statutes are not before us, we cannot address them. We do note, however, that there could be other constitutional problems associated with such statutes, including possible violations of the Due Process Clause and the First Amendment.

22

selling, distributing, and copying with a commercial motive, activities at the core of the Commerce Clause.[8] See Gonzales v. Raich, 545 U.S. 1, 25 (2005). It would have been eminently reasonable for Congress to conclude that the sale and distribution of bootleg phonorecords will have a substantial interstate effect on the sale and distribution of legitimate phonorecords. Because Section 2319A is not a copyright law and its enactment was well within the scope of Congress's Commerce Clause authority, it is constitutionally permissible unless some other constitutional provision prevents its enforcement.

## IV. First Amendment

Martignon argued below and amici Twenty-Nine Intellectual Property and Constitutional Law Professors argue here that Section 2319A violates the First Amendment because it is unconstitutionally overbroad, containing no fair use exception or durational limitation. The district court did not reach this argument because it found a violation of the Copyright Clause. We therefore remand to allow the district court to consider the First Amendment argument.

### CONCLUSION

For the reasons that we have discussed, we vacate the dismissal of the indictment against Martignon and remand for further proceedings consistent with this opinion.

---

[8] This commercial purpose distinguishes Section 2319A from Section 1101. A person who recorded a concert for her personal enjoyment would not violate Section 2319A. Further, because no commercial motive is required for a Section 1101 violation, we specifically limit today's holding to Section 2319A and express no opinion on Section 1101's constitutionality.

23